MURRAY *v.* GALBRAITH.

Opinion delivered May 23, 1910.

1. LIBEL AND SLANDER—DAMAGES.—One who publishes a false article calling in question the character of another for probity will not be liable for exemplary damages, but only for compensatory damages, unless there was ill will toward the person assailed or the publication indicated a wicked and abandoned disposition on the publisher's part. (Page 206.)

2. SAME—COMPENSATORY DAMAGES—MITIGATION.—One who publishes a false article impeaching another's integrity may not prove the circumstances for the purpose of mitigating or reducing the amount of compensatory damages, as the law implies malice from the publication of a libel and gives the party injured redress in compensatory damages. (Page 207.)

3. APPEAL AND ERROR—HARMLESS ERROR.—A verdict for the plaintiff in an action for libel awarding only compensatory damages cures any errors in rulings against the defendant in instructions as to exemplary damages. (Page 207.)

4. LIBEL AND SLANDER—INSTRUCTIONS.—It was not error in a libel case to refuse to instruct that defendant was not liable for damages to plaintiff by virtue of any current rumor or report to the same effect as the printed charges complained of if the court instructed the jury that defendant was liable only for such damages as were caused by his publication. (Page 208.)

5. SAME—WHEN ERROR CURED BY INSTRUCTIONS.—If it was error under the issues in an action for libel to admit testimony tending to prove an injury to the plaintiff's business, such error was cured by an instruction that plaintiff was not entitled to recover such damages. (Page 208.)

Appeal from Jefferson Circuit Court; *Antonio B. Grace,* Judge; affirmed.

STATEMENT BY THE COURT.

This is an appeal from a judgment of the Jefferson Circuit Court wherein appellee, on May 19, 1909, recovered a verdict for damages in the sum of $1,000 in a suit for libel on a second trial thereof. On the first trial there was also a verdict for plaintiff, which was reversed on appeal to this court. *Galbraith v. Murray,* 86 Ark. 50.

The complaint alleged that Murray was the editor and proprietor of *The Press Eagle,* a weekly newspaper published in Pine Bluff, having a general and large circulation in the State, more particularly in Jefferson County, also in divers other States:

that plaintiff and one J. B. York and C. Voss were commissioners of Graveling District No. 1, for paving Fifth Avenue in the city of Pine Bluff, and as such had charge of the work, and were still handling the funds of the district; that on the 19th of June, 1906, Arthur Murray falsely and maliciously composed and published in *The Pine Bluff Weekly Press-Eagle* of and concerning the plaintiff the following:

"There can no longer be any doubt of the fact that there is 'something rotten in Denmark' so far as the affairs of Graveling District No. 1 are concerned. Despite the tenderfootedness of two members of the committee appointed by the interested and defrauded property owners to make an investigation, facts have developed that clearly prove that the commissioners have charged their neighbors and fellow property owners of Fifth Avenue $10,477.85 for gravel, for which they paid the St. Louis Southwestern Railway Company only $3,431.80, leaving a 'net profit' in this transaction alone of over $7,000. If the commissioners profited in this transaction, it is not unreasonable to suppose that they profited in the employment of labor and other items of expense necessary to the completion of this graveling district, which is conceded to be the most wretched botch of street paving ever perpetrated in this or any other community.

"*The Press-Eagle* is not addicted to publishing facts and figures involving the character of public or private citizens without being thoroughly advised as to the authenticity of these facts and figures. Therefore, when we stated last week that an apparent 'overcharge' of $7,000 had been made for gravel by the commissioners of Graveling District No. 1, we were very careful to be within the bounds of truth, and to express the matter in language as mild as possible so as to avoid giving offense or doing injustice to those responsible for the shortage, pending a thorough investigation by those most interested. This investigation has now been made so far as it is possible for the committee to proceed, and the facts in every way confirm the statement first made in this paper last week that the commissioners had overcharged the district for about $7,000 for gravel alone. The cost of excavating, hauling dirt, curbing, etc., has not as yet been investigated, nor are we advised that it will be. But, if the investigation should be made, we should not be surprised if 'overcharges' were found in these items, as

well as that disclosed by the investigation as to the cost of the gravel.

"There are three men who, by virtue of the trust imposed in them by their fellow citizens, should be able to explain why their records show that this overcharge of over $7,000 was made in the purchase of gravel from the St. Louis Southwestern Railway Company. These men are J. B. York, president; Carl Voss, secretary, and R. M. Galbraith, treasurer, of Graveling District No. 1. The two first named have been before the committee and interested property owners, and admitted their inability to explain the manifest overcharge. This leaves the burden of the explanation upon R. M. Galbraith, treasurer, who has been at Jacksonville, Ill., attending the funeral of a friend, for the past week or ten days.

"Meantime another meeting of the property owners of Graveling District No. 1 has been called at the Board of Trade for Thursday night of this week. By that time it is hoped that the obsequies at Jacksonville, Ill., will have been concluded so as to enable Treasurer Galbraith to return to the city and produce his vouchers and checks for $7,000, good and lawful money of the realm, that both his records and those of Secretary Voss show was paid to the St. Louis Southwestern Railway Company, and which the officers of that corporation assert over their official signature never came into their possession.

"In the classic language of the far-famed Sir Lucius O'Trigger, 'tis a pretty quarrel as it stands."

That on the same date these paragraphs appeared in the said *Press-Eagle*:

"Graveling District No. 1 is not the only paving district formed in Pine Bluff that was boodled. There are others."

"Still we see no very good reason why the check book can not be produced, even if the vouchers are missing."

Thereby seeking and intending to charge the plaintiff with the crime of embezzling the funds of the district, or fraudulently converting the funds of the district to his own use, and defrauding said district of said funds, thereby seeking and intending to falsely impeach the honesty, integrity, veracity and reputation of this plaintiff, and thereby exposing him to public hatred, contempt and ridicule.

Among other defenses set up in the answer were the following:

"5.    Defendant states that at the time of publication of the matter complained of by plaintiff he, the defendant, was reliably informed and honestly believed that same was true, and that same was a fair criticism upon the official conduct, as public officers, of the commissioners and officers of Graveling District No. 1 of the city of Pine Bluff.

"6.    Defendant says that he was induced to publish the matter alleged by plaintiff as libelous with the belief that same was true, and that same was a fair criticism upon the conduct of the officers of Graveling District No. 1 of the city of Pine Bluff, as public officers, by reason of the conduct of the plaintiff, whereby he made it to appear that such criticism was fair, and, so believing, defendant published the same in good faith, and without malice against plaintiff, and for the sole purpose of advising the property owners of said graveling district and the public interested of the true condition of affairs of said graveling district, which was at the time of said publication of great public concern and interest to said property owners and the public in said city of Pine Bluff, where said paper was published.

"7.    Defendant states that the published matter set forth in the complaint, and now complained of by the plaintiff, was commonly and generally reported and believed prior to the time of said publication in the neighborhood where plaintiff resided, and where said publication was made; that defendant heard the reports relative to such matters, and believed same to be true, and published same with such belief, without malice toward plaintiff or the intent charged in the complaint, and without intention to injure plaintiff.

"8.    Defendant states that, since the publication complained of, towit: on June 26, 1906, he published in said *Pine Bluff Press-Eagle* an article entitled 'Are Satisfied,' wherein it was stated that plaintiff, R. M. Galbraith, had explained satisfactorily to the property owners present at a meeting of the property owners of said Graveling District No. 1, held at the Board of Trade in the city of Pine Bluff, his conduct as commissioner and treasurer of said graveling district, about which so much has been said, etc., and on the same day he also published

therein an article entitled 'R. M. Galbraith Makes Statement,' setting forth in full a statement publicly made by plaintiff, Galbraith, explanatory of matters concerning said Graveling District No. 1, which had been the subject of investigation and his official conduct, as a public officer, with reference thereto."

The testimony on the second trial was the same as on the first except that on the last trial Chester Flournoy testified that he was in the employ of appellant as foreman in the office and assisted in printing the *Press-Eagle* on June 19, 1906. On that day it was much after four o'clock in the afternoon when the paper went to press. The paper was not printed and not put in circulation that day until after four o'clock, P. M.

Appellee testified in part as follows: "About the 10th of June I went away to Jacksonville, Ill., on account of the sickness of my brother-in-law. This was on Sunday. On the following Tuesday he died. He was buried on Thursday, and I stayed there until the following Monday, when I left for home at Pine Bluff, and returned here on Tuesday afternoon about 3 o'clock. (This was June 19.) I first heard of the publication of the articles in the *Press-Eagle* as soon as I reached home. I had not heard of it before."

Appellee also testified over the objection of appellant in part as follows: "When I came to the bank, I found all of our people, that is the employees of the bank, and the directors that I met, all in a great state of excitement. The first thing they said, "We are awful glad you got back. We didn't know but what this thing would go under, this bank." They insisted that I had to vindicate myself. In fact, it was a trial such as I never want to go through again; the effect was far-reaching. I was trying to have my sons do business in Jacksonville in the furniture and carpet business. From some means or other it was whispered around there that things were not quite straight."

Appellee was asked the following question: "Did the publication of that article affect your reputation and credit as a business man?" and, over the objection of appellant, appellee was permitted to answer as follows: "Why, certainly it did; it came near breaking me."

Among other instructions the court gave the following:

"11.   That the article published by the defendant and set out in the complaint is libelous *per se,* that it was not privileged, and that plaintiff is entitled to recover.

"12.   That, no special damages being proved or claimed in the complaint, plaintiff is not entitled to recover anything for such special damages.

"13.   That you should award to plaintiff such sum as compensatory damages as in your judgment the evidence shows that he is entitled to recover on account of such publication, as is explained in the sixth paragraph of these instructions.

"14.   If you find from a preponderance of the evidence that the libelous article in question was published by defendant with actual malice towards the plaintiff, then you should award such further sum in the nature of punitive damages as in your judgment the evidence would justify. But, unless you so find that such express or actual malice existed in the mind of defendant at the time of the publication, you should not award anything by way of punitive damages."

The sixth paragraph referred to was as follows:

"6.   Compensatory damages are such sums of money as will compensate the plaintiff for the mental pain and anguish suffered by him, and for the shame, disgrace and humiliation endured, and the injury to his character and reputation caused by the publication of false and defamatory matter concerning him."

The court also gave the following:

"5.   Unless the jury believe from the evidence that the published matter complained of was actuated by ill will, bad intent or malevolence towards the plaintiff, they can award to plaintiff only actual or compensatory damages; and such ill will, bad intent or malevolence is not to be inferred from the fact alone that the words complained of are false and are injurious to the plaintiff."

The court, among others, refused the following prayers of appellant:

"4.   The jury may consider, for the purpose of lessening or mitigating the damages claimed in this action, any evidence tending to show that he, the defendant, did not originate the defamatory charge complained of, and that same was a matter of common rumor or report prior to and at the time of the publication;

that at the time he published the comments or criticisms complained of he had good cause for believing and did believe that same were true; or that the conduct of plaintiff was such as to make it appear to defendant as a reasonable man that such comments and criticisms complained of were fair, and, so believing, defendant published same in good faith and without malice against plaintiff. The jury may also consider, for the purpose of lessening or mitigating damages, any evidence tending to show that, since the publication of the matter complained of, defendant published in the same newspaper in which the matter complained of was first published an article or articles correcting or tending to correct the defamatory matter complained of or of negativing such defamatory charge or charges.

"4½. The jury may consider, for the purpose of lessening or mitigating the damages complained of in this action, any evidence tending to show that he, the defendant, did not originate the defamatory charge complained of, and that same was a matter of common rumor or report prior to and at the time of the publication; that at the time he published the comments or criticisms complained of he had good cause for believing, and did believe, that same were true; or that the conduct of plaintiff was such as to make it appear to defendant as a reasonable man that such comments and criticisms complained of were fair, and, so believing, defendant published same in good faith and without malice against plaintiff.

"7. The defendant is not liable for any damages that may have been done plaintiff by virtue of any rumor or report that may have been current to the same effect as the charges complained of as published by defendant, except in so far as the publications complained of gave additional circulation or repetition to such charges, and such damage should be occasioned by reason of such additional, repeated or more extended circulation."

The jury returned the following verdict: "We, the jury find for plaintiff in the sum of $1,000 as compensatory damages."

Judgment was entered in favor of appellee for that sum, and this appeal has been duly prosecuted.

*W. F. Coleman* and *E. J. Kerwin,* for appellant.

One who utters a slander is not responsible for its voluntary and unjustifiable repetition by others over whom he has no con-

trol.  126 Mass. 329.  In cases of slander the defendant is only liable for such damages as result directly from his own utterances. 13 Am. & Eng. Ency. of Law (1 Ed.) 442.  On the question of damages to business at Jacksonville, Ill., see 80 S. W. 730. In considering the amount of damages in such cases it is proper to consider the circumstances under which the libel was committed. 72 Ark. 426.  General rumors of guilt may be given in evidence to mitigate damages.  13 A. & E. Ency. Law, 440.

*N. T. White* and *Ben J. Altheimer,* for appellee.

The words spoken are actionable *per se.*  55 Ark. 501; 86 Ark. 50.  The damages awarded by the jury are not excessive. 56 Ark. 103; 57 C. C. A. 45.  Malice is presumed from the unprivileged publication of a false charge.  36 C. C. A. 475; 48 Mo. 161; 122 Mo. 355; 26 S. W. 1020; 10 N. Y. 120; 55 Mo. 352.  If a libelous statement is false, good faith in the defendant will not absolve him from liability.  47 C. C. A. 384; 71 *Id.* 309; 81 N. Y. 126.  But the absence of malice may have a material effect in reducing the damages.  52 S. W. 934.

WOOD, J., (after stating the facts).  1.  We held on the former appeal that the article whose publication was the foundation of the present action was libelous *per se.*  *Murray* v. *Galbraith,* 86 Ark. 50.  That being true, really the only issue on the second trial was the amount of the damages.  This issue was submitted on instructions that were full, accurate, and fair to appellant.  One who publishes a false article calling in question the character of another for probity is liable to the person whose character is assailed in an action for damages.  If the publication of the article is without express malice, *i. e.,* without any ill will or animosity on the part of the publisher toward the person whom he assails, and if the publication is made under circumstances that do not indicate any wicked and abandoned disposition or any evil motive on the part of the publisher in making the publication, then the damages to the party whose character is impeached can only be compensatory.  But, on the other hand, if the publication is through express malice, or under circumstances that indicate a wicked and abandoned motive in making it, then the person libeled may recover not only compensatory but punitive damages.

There can not be in law any justification or excuse for libel. "The purest treasure mortal times afford is spotless reputation." "A good name is rather to be chosen than great riches." Prov. 22-1 ; Eccl. 7-1. The law, recognizing this, makes libel a crime (section 1850, Kirby's Dig.), and also requires one who libels another to respond in damages to the party aggrieved, no matter what may be the circumstances under which the libel was evoked or provoked. The absence of personal animosity or ill will, or of evil motive, in committing the libel may be proved for the purpose of showing that the party libeled is not entitled to vindictive or punitive damages.

But the publication of a false article calling in question the integrity of another, *ipso facto,* implies malice, and the law will not permit one who makes such publication to show the circumstances under which it was done for the purpose of depriving the party libeled of compensatory damages. Nor will the law permit the circumstances to be shown for the purpose of mitigating or reducing the amount of such damages. Our own court and the authorities generally sustain the doctrine here announced. *Stallings* v. *Whittaker,* 55 Ark. 501; *Gaines* v. *Belding,* 56 Ark. 103; *Times Pub. Co.* v. *Carlisle,* 36 C. C. A. 475; *Palmer* v *Mahin,* 57 C. C. A. at p. 45, 48; *Kansas City Star Co.* v. *Carlisle,* 47 C. C. A. 384, 397; *Park Pub. Co.* v. *Butler,* 71 C. C. A. 309; *Hamilton* v. *Eno,* 81 N. Y. 126; *Nicholson* v. *Rust,* 52 S. W. (Ky.) 934.

The case of *Patton* v. *Cruce,* 72 Ark. 426, is not in conflict with this. There the court through Judge RIDDICK said: "It is proper to take into consideration the circumstances under which the libel was committed." But the court had under consideration and was discussing undisputed facts showing express malice, which would entitle the party libeled to punitive damages

It follows that the court did not err in refusing appellant's prayers numbered 4 and 4½. So far as these were applicable to the issue of punitive damages, they had been fully covered by the court in other instructions. Besides, the verdict of the jury finding in favor of appellee for only compensatory damages cured any error that might have been in the rulings of the court on the issue of exemplary damages. But there were no errors.

2.  The court did not err in refusing appellant's prayer number 7.  The instructions given by the court confined the jury to the "compensatory damages caused by the publication" and to "such compensatory damages as the evidence showed he was entitled to recover on account of such publication."  The court correctly defined compensatory damages.  Under the instructions of the court, the jury could not have found appellant liable for current rumors and reports derogatory to the character of appellee which were put in circulation by others.  Appellant under the instructions could only be found liable in damages for the injury produced by his own publication.

3.  We find no prejudicial error in the rulings of the court pertaining to the admission of the testimony of appellee and other witnesses.  The testimony of appellee was germane to the issue as to whether the publication had the effect to "impeach the honesty, integrity, veracity and reputation" of appellee, as was alleged in the complaint, and, if so, to what extent.  But if the testimony tending to prove injury to appellant's business and tending to impeach his reputation as a business man was incompetent, then the error of the court in admitting it was cured, and any prejudicial effect it might otherwise have had was taken away by the instruction of the court which expressly told the jury "that, no special damages being proved or claimed in the complaint, plaintiff is not entitled to recover anything for such special damages."  And by the further instruction that "actual or special damages represent a pecuniary loss shown to have been sustained by the plaintiff as the direct result of the publication of the false and defamatory matter complained of."

There is no contention that the amount of the verdict for compensatory damages is excessive.  The evidence in the record on behalf of appellant, and from his viewpoint, entirely exonerates him from the charge of express malice, and shows that in making the publication he was actuated only by the desire to serve the public in exposing what he honestly believed, from the information then at hand, to be a piece of outrageous "graft" on the part of public officials.  It turned out, however, that appellant was mistaken in the facts, and, not waiting for accurate knowledge, published an article which proved to be untrue, and which was a defamation of the character of appellee.  The publisher in such case, although inspired by the laudable purpose of

denouncing dishonesty in public officials, is nevertheless guilty of libel if his publication impeaches the integrity of particular individuals; and if the facts he states are false, he acts at his peril. Although there may be no express malice, the law, as we have seen, implies the malice essential to constitute libel from the publication of a defamatory article, and gives the party injured redress in compensatory damages. 25 Cyc. pp. 491e, 492h.

The judgment must be affirmed.