## HONEA *v.* KING.

### Opinion delivered July 3, 1922.

1.  LIBEL AND SLANDER—CONSTRUCTION OF ARTICLE.—In ascertaining the meaning of written words to determine whether they are libelous, the entire article must be construed.

2.  LIBEL AND SLANDER—CONSTRUCTION OF ARTICLE.—In ascertaining the meaning of written words to determine whether they are libelous, the words are to be taken in their plain and natural meaning.

3.  LIBEL AND SLANDER—PUBLICATION NOT LIBELOUS.—An article signed by defendant stating that plaintiffs and defendant belonged to a partnership, that they had differences about the manner in which the business should be carried on and as to their rights under certain contracts, that defendant had not done well in investing in such business, that he received only a part of what his profits should have been, that plaintiffs had shown bad man-

agement in making and collecting debts of the firm, but not alleging or imputing dishonesty or misconduct to the plaintiffs, *held* not libelous *per se*.

Appeal from White Circuit Court; *J. M. Jackson*, Judge; affirmed.

### STATEMENT OF FACTS.

B. F. Honea and A. L. Honea instituted this action against E. M. King to recover damages for an alleged libel publised in the McRae Progress, a newspaper of general circulation in White County, Ark.

The complaint alleges that the plaintiffs and the defendant were members of the same business partnership and that the publication in question grew out of their partnership transactions and impeached the business integrity of the plaintiffs.

The complaint sets out in full the alleged false publication and it is as follows:

As long as the Honea Mercantile Company has gone into print and thereby leading the readers of the paper to believe that E. M. King has not only spread a false report but has received from them a square deal, all that he was entitled to as per terms of company partnership, under which said firm was organized, and also the personal word of B. F. Honea, I desire to make a true statement of the whole matter. The terms of the guarantee at the time of organizing was that each stockholder should receive the amount of dividends earned according to money invested, and at any time any member should become objectionable to the firm that he would withdraw his capital and accept as payment what it has earned while being used, and at any time any member was not satisfied with the firm, that the firm was to return to him the amount put in, with all earnings while invested in business, and that is the way both Mr. Joe Rechtin and Mr. Jackson went out of the firm. Now, in addition to the terms of the partnership, Mr. B. F. Honea gave me his personal guarantee, his word, before I consented to become a partner, and numerous times after-

ward, that at any time I wanted my money he would see that I got it, with all the accumulated dividends from the time I became a member of the firm. Now, did he do so? Not on your life. But instead, after I had found that he had opened up a store in competition to the firm's business, taking over the entire feed business of the firm, also any other goods out of the grocer line that he wanted of the firm's store and was selling it and placing the proceeds to his private account in the bank, I went to him for him to make his word good. Did he do so? Not by any means, but said instead, 'No, I want to sell out, too.'

"Now the Honea Mercantile Company has jumped into print to make it appear that E. M. King has done well on his $3,000 investment, and that I should be entirely satisfied. They state very explicitly, which is correct, what I got out of the business, but failed to state that they had set aside the earnings on my stock, $926.50 up to the first of January, 1921, that I did not get. Neither did I get anything for the use of $4,926.50 from the first day of January, 1921, to June 10, 1921, and $3,926.50 until June 30, 1921, except my account as mentioned in their article which was $197.27. Now, about the 1st of February, 1920, I was informed that the business had earned a dividend of $4,000, and that my part was $1,471, but on account of sickness, before I could get my part, it had been put back into the business by B. F. Honea, manager, but the best I—(the rest of this sentence blotted out in paper, as shown by copy of paper attached to complaint).

"I was informed by Albert Honea that, after the $1,117.78 dividend had been declared to my part, there could not possibly be any more losses.

"Now, after deducting $662.28 account I had a ballance for the year 1920 of $455.54, making a total of my investment from September 6, 1919, to January 1, 1921, $2,588.78, what I received for this amount was $1,662.28, instead of $2,588.78. Now E. M. King would be perfectly satisfied with what he had gotten out of this business if

the people from whom has been exacted this amount of $926.50 had been reimbursed by the Honea Mercantile Company, together with what the money had earned from January 1, 1921, to June 30, 1921, had it or could get it, but as it is in the hands of Albert and B. F. Honea I am not especially pleased with the way it was obtained by them.

"On June 10th I called for my dividend, which was in their hands as herein described, and after some hesitation and excuses by Albert Honea on account of poor collections, etc., I was finally given a check for $1,000, with a promise of the other as soon as sufficient collections were made, and I inquired three or four times about the collections between the 10th and 13th of June, and very little or nothing had been done, when really and truly there had been, according to B. F. Honea's statement on June 30, $12,000 had been collected. Yet it was impossible to pay over to me $1,926.50, then past due, some of it for over a year. Now, I wish to state and am willing to make oath to same, that a day or two after I had given Albert Honea and Allie Harrison to understand I knew how the feed business had gone, B. F. Honea came to me and stated that Allie Harrison had told him what I said about the feed business, and told me positively that the feed business was just as it had always been; that he had borrowed $1,000 and that was about all the firm owed. This was about three or four days before I closed out to them, and I knew positively at the time that he had not only taken the feed business out of the firm, so far as I could be benefited by it, but had turned it over to Bob Bailey, with instructions to keep the proceeds separate from that of the other business, long before he bought out the feed store, and I knew then that he was not only selling feed, but any other articles he wanted out of the firm's store and having the proceeds placed to his private credit in the bank. What right had he to take any line of merchandise out of our business without the consent of all concerned, and start a compe-

titive business of his own to be fed from the company's store? He usurped the rights of all profits from the feed business, one of the best, if not the best, in the business.

"What was this done for? Can you, gentle reader, imagine? Why didn't his son, who was a partner and bookkeeper, as well as clerk, object? Certainly he knew what was going on, although when I ask him how the feed business was handled, he said he did not know, 'that when anything was charged he charged it'. That was all I could get out of him. Poor satisfaction for me, a partner.

"'B. F. Honea's Personal Word.

"'B. F. Honea came to me some time in July or August, 1919, and stated to me that he wanted to put out J. T. Lyon, and that he did not have sufficient funds to do so and stock it up as it should be, stating that he wanted to do a general dry goods, grocer, and feed business, and that he was agent for the Cunningham Commission Company, for all points in White County, except Searcy, and got $7.50 per car on all feed sold in the county, except Searcy, and that he would put the feed business into the firm, which was done, and so remained until taken out as herein stated. I told Mr. Honea that I was no business man, but had explicit confidence in his honesty and qualifications, and would put in $3,000 by the time he needed it, but I assured him that he was the only merchant that I knew of that I would go into copartnership with, and that I depended wholly upon him to see that I got a square deal, and that confidence was not shaken until after he attempted to put off two land notes on me that represented $1,500, with only about $900 to secure their payment, for my 1919 and 1920 dividends amounting to $1,926.50.

"'He gave me his word that he would see that I got back every dollar that I put in with all that it earned in dividends.' Now what about this $926.50 that was set aside by the managers and these earnings on the capital

from January 1, 1912, to June 30, 1921, was it earned or taken from the patrons of this business? I did not get, they said it was mine.

" 'Their only excuses offered for the foregoing methods employed was bad accounts, reduction in prices, and poor collections.

" 'Remember, there can be no dividends declared as long as there are losses; also, from the best information obtainable, other merchants in McRae were very successful in making collections from their customers during the berry season.

" ' Also but little losses have occurred from reduction in prices since January 1, 1921. These excuses reflect heavily upon the customers of Honea Mercantile Company, if they are correct.

" 'I stated repreatedly to B. F. Honea that I was perfectly willing to stand any losses that might occur in my portion of the business.

" 'But Albert preferred to put me out, and sent Alley Harrison to make these wants known, but not until after I had began to dig around too close to the feed store proposition.

" 'I made them a proposition which I thought that any man who wanted to deal fairly would accept, but it was turned down. The $926.50 was not included, which Albert Honea had held up on the 10th on account of poor collections, as he stated, when there had been $12.00 collected. If B. F. Honea states the truth.

" 'Then B. F. Honea came to me and said that he had offered to take for his interest one thousand dollars, his living and the money he put in the business. That was enough to satisfy me, that if there was an offer made for my interest that what he had stated would be just what they proposed to allow me. I told Mr. Tucker and my son two days before their offer was made precisely what it proved to be.

" 'I knew every inch of the ground I stood on. I knew I had to lose the $936.50 dividends or run a great risk of losing the whole thing.

" 'I had been notified by B. F. Honea that on the first day of July the books would be closed and cash business would be done in the future.

" 'I knew what had been done with the feed business and what could be done with the cash business. I had no right to expect that the same methods would not be employed in both cases, so I sold to Albert Honea, at a loss, according to their own figures, of $926.50, and the earnings on my money as,heretofore described.

" 'I recognize that this is a pointed statement, but I back every word I have written as true.

"E. M. King.''

The defendant filed a demurrer to the complaint, which was sustained by the court. The plaintiffs declined to plead further, and upon their complaint being dismissed, they have duly prosecuted an appeal to this court.

*Gregory & Holtzendorff,* for appellant.

The article published by appellee is libelous *per se.* 25 Cyc. 256, 262, 337, 341; American Annotated Cases 1913-B, p. 253; 20 A. & E. Am. Cases, p. 717; 95 Ark. 199.

Even though the article was not libelous *per se,* the complaint states a cause of action by alleging special damages, and a demurrer should not have been sustained.

*Brundidge & Neelly,* for appellee.

The article published by appellee was an endeavor to vindicate himself, and published in good faith for the purpose of repelling a charge, and was privileged. 17 R. C. L. 364; 72 Ark. 425; 18 A. & E. Enc. Law, 1033.

The only possible way for the article to be considered libelous would be by innuendo, and the complaint does not charge that. The words must be given their ordinary and natural meaning. 11 L. R. A. 668.

HART, J. (after stating the facts). Counsel for the plaintiffs rely upon the case of *Murray* v. *Galbraith,* reported in 86 Ark. 50, and in 95 Ark. 199.

We do not think that case applies. There the publication in express words charged the commissioners of an improvement district with an overcharge of $7,000 in the purchase of gravel, and stated that the improvement district was not the only paving district formed in Pine Bluff that was boodled.

In ascertaining the meaning of written words to determine whether or not they are libelous, the entire article must be construed. The general rule is also that the words are to be taken in their plain and natural meaning and to be understood by courts and juries as other people would understand them, and according to the sense in which they appear to have been used and the ideas they are adapted to convey to those who read them. *Skaggs* v. *Johnson,* 105 Ark. 254. Hence it was necessary to set out the whole of the published article, although it is very long and is rambling in character.

By giving to the words used in the published article their most natural and obvious meaning and by giving to them that meaning which would most naturally be ascribed thereto by those who would read the articles, we do not think the publication is libelous *per se.* The natural and ordinary construction that would be placed upon the article would be that the plaintiffs and defendant had belonged to the same business firm and had had differences about the way the business should be carried on and as to their rights under certain contracts with each other. The article does not impute dishonesty to the plaintiffs nor does it accuse them of any misconduct in the business that would tend to impeach their integrity or veracity. The article sets forth somewhat in detail the differences between the plaintiffs and the defendant, and it is rather argumentative in character. The publication seems to have been an effort on the part of the defendant to state the various transactions had be-

tween himself and the plaintiffs and to show that he was right in the whole matter.

He does state specifically that he had not done well in investing in the business with the plaintiffs, but he does not accuse them of any actual dishonesty. He does state what his amount of the profits in the business should have been and that he was only paid a part of this amount. He states he was given a check for $1,000 with the promise to pay more as soon as sufficient collections could be made. He made several efforts to learn about the collections and they told him that they had been unable to collect the debts.

King also questioned the right of the plaintiffs to establish a feed business and take that line of business out of the partnership; but he does not accuse the plaintiffs of any actual fraud or dishonesty in that respect. It is true that the defendant, King, also stated in the article that the plaintiffs had attempted to put off land notes on him that represented $1,500 with only about $900 to secure their payment. He does not charge them, however, with fraud or dishonesty in this respect. The notes may have been good without any security at all.

The article does charge the plaintiffs with bad management, especially in the making and collecting of the debts of the concern; but there is no imputation of dishonesty or misconduct in the business charged against the plaintiffs. The publication cannot be construed to accuse the plaintiffs of doing anything in connection with the business that they did not have a legal right to do under the contract as construed by them. There are no facts alleged to connect the publication with any transaction by which the court could say that the publication is libelous *per se*.

We must therefore conclude that the complaint does not state a cause of action, and that the trial court committed no error in sustaining the demurrer to the complaint.

The judgment will therefore be affirmed.