JOSLYN MANUFACTURING & SUPPLY COMPANY v. WHITE.

4-8113                                                    200 S. W. 2d 789

Opinion delivered March 24, 1947.

*J. F. Quillin*, for appellant.

*Boyd Tackett* and *M. M. Martin*, for appellee.

GRIFFIN SMITH, Chief Justice. Appellee has moved this Court to strike from the bill of exceptions appellants' motion for a new trial, made orally, and subsequently reduced to writing, on the ground that it was not filed in time. Trial with judgment was concluded April 17, 1946, at which time a docket notation is that motion for a new trial was made and overruled. The defendants were granted an appeal, with 120 days for bill of exceptions. Appellants filed their written motion August 26, 1946. It was not presented to the Judge. The Clerk's indorsement shows filing as of April 17th. August 28th appellee moved to strike. Court convened September 13th to hear the motion, and after argument entered an order overruling appellee's prayer.

A majority of the Court is of opinion that appellee is without standing here because he himself failed to ask for a new trial on the issue touching the trial Court's refusal to strike the motion. *Martin* v. *Pierce Petroleum Corporation*, 174 Ark. 1161, 298 S. W. 494.[1]

Henry Roth, one of the defendants below and an appellant here, was local manager in Polk County for the Joslyn Company, a foreign corporation with its home office in Chicago. Small sawmills were owned and operated, in consequence of which lumber was delivered to yards in Mena. White, the appellee here, supervised one of the mills until August 24, 1945, and was compensated

---

[1] Dec. 23, 1946, this Court made the following order: "8113— *Joslyn Mfg. & Supply Co., et al.* v. *Kermit F. White*, from Polk Circuit: Appellee's motion to strike bill of exceptions is passed for consideration when appeal is submitted. The Chief Justice thinks the motion should be granted".

$9 per thousand board feet. The lumber was cut and stacked near the White-managed mill, where it was picked up by trucks operated by appellants and taken to Mena. All labor incident to mill operations was paid for by White. It is not clear whether at times some of the mill workers assisted in loading lumber onto the trucks. Appellee argues that all loading was done by the Joslyn Company. Inferences to be drawn from appellants' contentions are that in some manner White was responsible for the way trucks were loaded.[2]

This appeal is from a judgment for $3,225 based on a jury's verdict that Roth, in his capacity as general manager, accused White of short-stacking the lumber; that is, it was placed on the trucks in such manner that "dead spaces" were left in a way not noticeable if the load were only casually examined; hence, when the usual method of measuring length, breadth, and depth was applied in the process of determining the number of board feet carried, an erroneous result attended; in consequence of which White was overpaid.

Specifically, it is charged that on the occasion complained of Roth made an inspection of the mill, accompanied by a "trouble-shooter" who had been sent as assistant. Roth's testimony is that the mill's production was not satisfactory because, inferentially, the logs supplied, and resulting lumber, were so far out of balance as to indicate a diversion.

On the day in question Carl Howard was hauling from the rural mill to Joslyn's Mena Yards. Checking was done "near the cemetery on the Dallas Road." White's version of the transaction is that Roth (in the presence of Howard and other mill workers) asserted he had caught him "short-stacking in order to get more scale." To this statement Roth is alleged to have added: "You are running it and are bound to be doing it. We will

---

[2] Roth testified that when he went to the mill Aug. 24 he found "his" (presumptively White's) employes stacking lumber on a truck, and that it was being stacked so as to leave a "hole" immediately back of the cab; that a dimension measurement of this load would have shown "more lumber scale than was actually on the truck".

shut down and get a new crew." Orders were given to discontinue operations.

On cross-examination White reinforced his complaint of ill use by testifying that Roth said, "You are stealing lumber scale, and I cannot use you any longer." Although Roth denied having used the word "steal," or a term of similar import, and insists that his entire conversation was directed to the purpose of calling attention to results from which suspicion of shortage might arise, there was sufficient proof to go to the jury; and whether Roth did, or did not, say the things he is now confronted with, witnesses were supplied by White who corroborated his assertions that the slanderous expressions not only were used August 24th, but were repeated when mill workers went to Joslyn's office the following Monday to inquire why operations had been discontinued.

In short, whether Roth has been quoted correctly or incorrectly, there was substantial testimony upon which liability could be predicated, and in that respect appellants' argument that there should have been a directed verdict for the defendants cannot prevail; nor, in the light of testimony given by witnesses for the plaintiff, can it be said, as a matter of law that the communication —when coupled with an accusation of theft—was privileged, or qualifiedly so. It was not a part of Roth's duty to inform White's employes of the accuser's beliefs, expressed in the manner testified to. The applicable rule was discussed by Mr. Justice FRAUENTHAL in *Bohlinger* v. *Germania Life Insurance Co.,* 100 Ark. 477, 140 S. W. 257, 36 L. R. A., N. S. 449, Ann. Cas. 1913C, 613. See also *Polk* v. *Missouri Pacific Railroad Co., et al.,* 156 Ark 84, 245 S. W. 186, 29 A. L. R. 220. In the Polk case the railroad company's superintendent said in the presence of certain persons who testified: "Mr. Polk, are you prepared to reimburse the company for the time you defrauded them out of? Unless they are reimbursed you stand liable to criminal prosecution by the company." The trial court's directed verdict for the defendant was affirmed on appeal. *Contra,* see *Sinclair Refining Com-*

*pany* v. *Fuller*, 190 Ark. 426, 79 S. W. 2d 736; *Hathcox* v. *Stewart*, 178 Ark. 235, 10 S. W. 2d 362. Other cases are referred to in the decisions cited.

Was the verdict for an excessive amount? The Joslyn Company argues that even though Roth be liable, the corporation as such had nothing to do with the immediate transaction; that Roth was not authorized to make charges such as we are dealing with, and if he did so the action was not within the scope of his agency or representative capacity. The position is not tenable. Roth was vice-principal in so far as dealing with the product of White's mill was concerned.

It is conceded that the inspection August 24th was to ascertain why losses should occur. It is true Roth testified he did not accuse White of stealing, nor in express words say the company was being "short-stacked"; but against this evidence there are appellee's witnesses who say Roth used the slanderous language, and that he further said White's employes participated in loading the trucks and all must have known of and taken part in the deceit. In the light of Roth's position and the duties assigned him, his actions in commenting upon activities of the kind in question could not well be disassociated from his duty to the employer. Joslyn must answer to the extent of any injury inflicted by the charges the jury found he had made.

It does not follow, however, that appellee has been damaged to the extent of $3,225; on the contrary, there is nothing substantial to show that any (other than the plaintiff) considered the injury as one affecting White's standing or reputation in the community, or elsewhere. In short, assuming that Roth went farther in his characterization than the facts warranted, still the disagreement and its incidents were the result of impulses arising from what appeared on the one hand to be deliberate infractions designed to irregularly increase appellee's income, and on the other hand Roth's condemnation of the practices he believed were being engaged in. It is significant that appellee, on direct examination, did not say that

Roth, in precise language, accused him of stealing. Referring to an alleged conversation "in the back of the mill" before the defamatory language is supposed to have been used, White was asked:

"Did Henry Roth make any statements to you in the presence of others, and, if so, who were the others?" Answer: "Carl Howard, Randolph Jenkins, 'Dad' H. L. Holsom, Herman Holsom, Louis Holsom, Bill Marshall, Arthur Holsom, Bud Hogan, W. S. Marshall, Noah Highland, and Sam Lee." Question: "Now, in the presence of these men, and in your presence, what statements did Roth make at that time?" Answer: "Well, he said, 'I caught the lumber hauler short-stacking lumber in order to get more lumber scale; and you are running it, and you are bound to be doing it.' Then he said, 'We will shut this down and get a new crew'."

On cross-examination this testimony was amplified by the assertion, "He said I was stealing lumber scale. Then he said he couldn't use me any more."

It may be deduced from the evidence that the first conversation quoted by White, wherein the word "steal" was not used, and the assertions on cross-examination regarding what was said, occurred at different places. But, in any event, the charge that White was stealing had reference to short-stacking and not to physical appropriation of lumber belonging to the company. All of the circumstances contradict the idea that Roth's actions were malicious.

In *Murray v. Galbraith*, 86 Ark. 50, 109 S. W. 1011, 126 Am. St. Rep. 1078, a decision by the Supreme Court of New York was quoted with approval, containing this statement:[3] "Where a libelous article is published before the commencement of an action, a separate action cannot be maintained on such republication. The repetition of the publication may be pleaded and shown on the trial as bearing upon the malice of the defendant and the extent of the injury and damage to the plaintiff." In

[3] See *Murray* v. *Galbraith*, 95 Ark. 199, 128 S. W. 1047.

writing the Murray-Galbraith opinion Chief Justice HILL said: "The law seems well settled that a repetition of an identical libel is not a new cause of action, but an aggravation of the preëxisting cause, and is always competent evidence tending to prove malice."

White testified that the accusations "hurt his feelings," and that he had been refused employment by mills and lumbermen. On behalf of appellants there were witnesses who testified that the statements imputed to Roth did not in any manner influence them against White, and if there had been denial of employment it was because he was not needed.

In testifying regarding Roths' accusation, White was asked: "All Roth told you was that he had discovered that lumber coming from your mill into the Mena yard had been short-stacked, and therefore the company was paying you for lumber you hadn't been sending?" Answer: "No, sir." Question: "What did he tell you?" Answer: "He said I was bound to know about it because I was running the job." Question: "If one of those truck loads had been short-stacked you would be paid for that, wouldn't you?" Answer: "Yes, sir." Question: "Then, if that is true, you had been receiving money you hadn't earned: is that right?" Answer: "That's right."

After testifying that he had applied to Mena Lumber Company (subsequent to August 24th) for work and that the manager, Vic. Crane, "didn't give him a job," White was asked: "What did he tell you?" Answer: "He told me he couldn't use me." Question: "Did he tell you why?" Answer: "No, sir." And yet, farther on in the record, and while still discussing Crane's refusal to employ him, White testified that Crane told him the Mena Lumber Company could not employ him "until I got this straightened up."

In response to other questions White unhesitatingly conceded that if the lumber had been short-stacked as alleged, he would have received more than a just credit.

It is quite clear, therefore, that even under appellee's testimony there was no showing of willful, wanton, or

reckless conduct. It follows that Instruction No. 7 ought not to have been given. By it the jury was told that if it should find the slanderous words alleged in the complaint were spoken wantonly, recklessly, "and with an utter disregard as to whether they were true or false, . . . the plaintiff is entitled to recover exemplary and also compensatory damages." Substantially the same statement of law was made in Instruction No. 10. Both were objected to, although not specifically. The jury's finding is merely "in favor of the plaintiff," without indicating whether punitive damages were added to a sum allowed as compensation.

Our conclusion is that the instructions were of a character to warrant the jury in believing it had at least been impliedly told that punitive or exemplary damages could be awarded. The amount of the verdict indicates this was done.

This error can be cured by a reduction. If a remittitur of $2,225 is entered within fifteen days, the judgment will be affirmed for $1,000; otherwise it will be reversed and the cause remanded for a new trial.

Justice MILLWEE not participating.