WEST MEMPHIS NEWS, INC. v. BOND.

4-8345                                    206 S. W. 2d 449

Opinion delivered December 15, 1947.

*Claude F. Cooper* and *T. J. Crowder,* for appellant.

*Wils Davis* and *Joe C. Barrett,* for appellee.

GRIFFIN SMITH, Chief Justice. The action was for damages resulting from libelous matter written by Paul and John G. Coughlin and printed in West Memphis News, a weekly publication they own.[1] The cause was transferred from Crittenden to Craighead County on a change of venue requested by the defendants. The plaintiff, C. H. Bond (who is County Judge) asked for $10,000 to compensate actual and punitive damages. From a judgment for $500 in his favor the publishers have appealed.

The defendants, admitting responsibility for the editorials in question, sought threefold avoidance: (1) All reasonable efforts had been exerted to ascertain the facts, and the charges made were true. (2) Even if it could not be shown that the accusations were substantially correct, words actually used were not susceptible of the construction plaintiff placed upon them. (3) The plaintiff was not in fact injured in reputation or purse.

C. H. "Cy" Bond was a candidate in the primary election of August 1946, seeking the nomination for

---

[1] Included in the complaint and named as defendants were West Memphis News, Inc., Arkansas Publishing Company, Inc., and the two Coughlins. [Records in the office of the Secretary of State do not disclose an Arkansas Publishing Company incorporation. Charter of West Memphis News was cancelled April 5, 1946].

County Judge. He was opposed by an independent affiliated with the GI group. Bond's principal support came from the democratic organization with which he had for many years been affiliated. It is commonly conceded that he was titular head of the organization. As such, and by reason of his personal popularity, Bond exercised a dominant influence in county politics. He is shown by the record to be aggressive, but not in a belligerent way. It was sought to show that opponents were penalized, and that power of the ''machine'' was used against those who for a protracted period refused to align themselves with the group that had so long prevailed.

Influential members of the forces so recently mustered out with honorable discharges believed that through local mobilization and application of the vigor shown in their country's behalf they could establish a new political deal—and, as they so enthusiastically expressed the plan, restore government to the people. Opposing this experiment there were those who wholeheartedly gave to Bond and his associates the full measure of their confidence. They steadfastly denied that subversive methods were employed, or that penalties were applied where loyalty was lacking.

It necessarily followed that in circumstances like these the opposing factions would wage bitter warfare. This they did.

Two Crittenden County newspapers featured in the controversies: the ''Times,'' published by C. H. Brown, favoring Bond's group, the other—West Memphis News —bearing allegiance to the GI cause. The News was purchased in March 1945 by the Coughlin Brothers. Although John G. registered for the draft at Trumann, Arkansas, yet when released from the Navy he went to Pensacola, Florida, where Paul was stationed. Together they went to West Memphis and shortly after March 8th, 1945, began publishing the News. Each of the brothers was familiar with proceedings had in Federal Court at Jonesboro wherein certain Crittenden County officers were charged with having conspired, in violation

of Criminal Code Sec. 37, 18 U. S. C. A. Sec. 88, to commit an offense against the United States by depriving, under color of State law, certain persons of the rights, privileges, and immunities secured to them by the Constitution and laws of the United States. Three were convicted and judgments against them were affirmed when reviewed by the Circuit Court of Appeals.[2]

According to testimony given by the defendants, they had believed that the Federal Court trials had corrected the abuses charged by the United States, and were surprised to learn that some of those who had been accused were still holding public office and exercising influence in party councils. Believing, as the publishers expressed it, that a deplorable situation required drastic treatment as an incident to reformation, they began the assault August 27 with an editorial entitled, "One Step Ahead of the 'G' Men". In the text, notice was given that "We will, for instance, show how Judge Bond has corrupted the county road program to his own financial betterment".

August 30 the headline was, "Evidence Enough to Convict Whole Gang". It was then said: "This is for you, Judge Bond, recognized leader of the corrupt remnant of the county gang whose shameless Nazi-like violations of civil liberties of countless American citizens brought a federal investigation, trials, convictions, and resulting bad nationwide publicity and disgrace to Crittenden County and the State of Arkansas. . . . Now you say [Coughlin Brothers] are afraid to come out in the open. . . . Well, wait and see! These ex-soldiers who fought for their country while you and your gang got rich allowing gambling dens and brothels to operate openly, by misuse of county funds to build roads on and to your own property, by cheating ignorant Negroes, and various other grafts".

September 13th the question was asked, "Is It Mud-Slinging to Print the Truth About Politicians Who Get Rich in Office?" And then:—"We print the undeniable

---

[2] See *Culp* v. *United States,* 131 Fed. 2d 93; also *Milsaps* v. *Straus.* 208 Ark. 265, 185 S. W. 2d 933.

fact that Judge Bond has used county funds to build roads for his own personal benefit, and for the benefit of machine supporters. . . .''

Referring specifically to Editor Brown of the competing newspaper, the following appeared October 15: ''Shame on you, Mr. Brown! Your attempt to smear Dicky Sanders is a disgrace to our profession. Mr. Brown, you too may have some explaining to do in court, once the GI's get their hands on the county's records. The least you can hope for is a civil suit to recover some of the money you have been handed by the County Judge under the guise of payment for 'printing and supplies' ''.

October 18th it was asserted that the ''Machine [is] in Last Ditch Fight''. The text supporting this headline was: ''GI's attacking forces establish beach-head. Denouncing Machine Rule, they fire point-blank at Crittenden's high command. Your outfit, and similar gangs, have occupied the courthouse for twenty years. And what have you done for the County? You have served for your own personal betterment, growing rich from exploitation of your offices. Worse than that, you have so corrupted the ballot by your vote-stealing judges and clerks that you have reduced the citizenship of this county to a state of political peonage. Your callous disregard for the principles of democratic government has caused great numbers of our citizens to refuse to vote, knowing that their vote against your gang would not be counted. We who have fought against European dictatorship, backed by other liberty-loving citizens, will on V-C Day liberate this county from the shackles of Cy Bondage''.

John G. Coughlin, when asked as a witness what he meant when he published the editorial ''One Step Ahead of the 'G' Men'', explained that the reference was not to gun-men. The intent, asserted this defendant, was to say that ''they'' were still ahead of the Federal investigation, or making an attempt, ''so they wouldn't be getting into another mess like they did before''.

Question on cross examination: ''Now, under the heading, 'We will, for instance, show how Judge Bond

has corrupted the county road program to his own financial betterment'—will you tell the jury what you meant by the word 'corrupt?'" Answer: "To start with, that wasn't the main part of the article. By the word 'corrupt' I meant he used it to his own advantage. I didn't mean to say he had broken any law, or anything else, and I didn't mean to say Judge Bond was one step ahead of the G-men because he corrupted the road program. I meant to show he had done it. Corrupt is a sort of general term. I think that when anything is being misused or mishandled it has been in a sense corrupted. . . . I meant he had used the road program wrong, and by wrong I meant he had used it to his own interest instead of the interest of everyone. For instance, if some one unfriendly to [Judge Bond] had owned Marland Swamp he wouldn't have seen any great necessity for building the roads. . . . [What I meant was] that as a county official he used his influence to see that roads were put where they would enhance the value of his land, and he did it". There was the later explanation that "I did not say Judge Bond violated the law: I said he did something wrong".

Regarding the publication of August 30th in which it was asserted enough of evidence was at hand "to convict the whole gang", the witness said he was referring to a conviction in the eyes of the public. There was no intent to allege the commission of a crime in a legal sense.

Questioned concerning the editorial, "This is for you, Judge Bond—recognized leader of the corrupt remnant of the county gang", Coughlin answered that he meant it. By the word "corrupt" he intended to say to the public that there were gambling places, brothels and bootlegging in the county. These things, thought the witness, were corrupt "in the worst meaning, and as leader of the gang doing it. I didn't say he was doing it at all". Pursuing the same line of interrogation, the question was asked: "You did mean to include Judge Bond in that gang?" Answer: "I have never said Judge Bond got any rake-off of any gambling places: I said he associated

with people who did. I didn't say he did it at all—that he took anything".

When asked about the salutation, "This is for you, Judge Bond", and the subsequent charge that "you and your gang got rich allowing [the law to be violated and by] cheating ignorant Negroes, and various other grafts", the defendant replied, "I was not saying Judge Bond cheated anybody".

Finally, Coughlin was asked what his meaning was in asserting that Bond's "outfit and similar gangs" had served officially for twenty years, "growing rich from exploitation of their offices, . . . [and] worse than that, you have so corrupted the ballot by your vote-stealing judges and clerks, . . ." etc. The answer was: "I meant that in a machine county—especially in Crittenden county—an election is determined by the judges and clerks. . . . I did not refer to Judge Bond especially, but the machine had been violating the State law in doing it".

Coughlin first said he was referring to the "machine" when the pledge was publicly made to liberate the county from the shackles of "Cy Bondage". He then said C. H. Bond was not being "especially" referred to. When a direct yes or no answer was demanded the witness denied that the plaintiff was intended or that the reference was to him. The term was used merely as a rallying slogan.

The evidence as abstracted covers 232 printed pages. Judge Bond denied that he had built roads to or near his own property for the purpose of improving its facilities. Much of his land was in a neighborhood almost exclusively white, as contrasted with an average colored population of eighty per cent. for the county as a whole. For this reason roads had been built to accommodate the community as a whole. There was, of course, an incidental advantage, but it accrued because of necessary road improvement to which the neighborhood was entitled. Other witnesses testified that dirt roads in various parts of the County were impassable during winter months and

that work was neglected because improvements would benefit Judge Bond's political enemies.

There was testimony that election boxes had been "stuffed" by the addition of ballots on behalf of registrants who were not present. Other irregularities were said to have occurred, but appellee was not connected with these transactions by any testimony. Witnesses favorable to Judge Bond thought his administration of road funds and distribution of betterments had been appropriate. Their summations were highly commendatory.

In their brief appellants seek refuge in their construction of the language used in the several publications, insisting that it does not, by any fair inference, constitute libelous castigation or accusation. There is no charge that Bond committed a crime. On the contrary, they contend, the assertion that Bond "corrupted the county road program to his own financial betterment" is merely a statement that he "corrupted, or used, the county road program to his own financial betterment". The assertion that Bond was the recognized leader "of the corrupt remnant of the county gang whose shameless Nazi-like violations of civil liberties" brought on a Federal investigation and criminal convictions, was not actionable, it is insisted, "for the reason that it would constitute no crime or misdemeanor for Judge Bond to be a recognized leader of the *remnant* of that gang, [for] it is not alleged in said article that Judge Bond had anything to do with the gang". These expressions are fairly representative of others dealing with the extenuating attitude taken by appellants.

Mr. Justice HART, when writing the Court's opinion in *Simonson* v. *Lovewell,* 118 Ark. 81, 175 S. W. 407, said that matter published by Simonson in the Luxora Commonwealth of March 19, 1910, was actionable *per se.* In an article advocating the candidacy of C. B. Hall for Sheriff of Mississippi County, Simonson attacked Hall's opponent, John A. Lovewell, who had formerly served as Sheriff. Simonson said that Lovewell "has proven his utter inefficiency and unworthiness and has abused and forfeited every right he may have had to the support,

confidence and respect of the people. . . . Lovewell
is the worst retarding influence we have. . . . The
most [his] supporters seem to be able to say for him
is that he saved the poor people from [drainage] im-
provements and that he has been their friend, and How?
By squandering and appropriating to his own use the
thousands of dollars of the people's money that should
have been turned into the treasury of the county. . . .
In the case of the County vs. Lovewell, just tried in the
Chancery Court, Lovewell made no defense that he had
appropriated the county's funds as charged, but that he
was saved from prosecution by the three years' statute
of limitation and the Judge held only that . . . time
was a bar to the prosecution. . . . The confidence man
always poses as your friend and always will while getting
his graft. . . . It would be far more pleasant and in-
finitely to the credit of the county if such records as this
had never been made, though such records and their
maker, who is entitled to no screening or support, should
be brought into the light and given their due, then buried
forever, and newer and better men and records supplant
them at the earliest opportunity''.

Judge HART said: ''The article was libelous *per se.
Patton* v. *Cruce,* 72 Ark. 421, 81 S. W. 380, 65 L. R. A.
937, 105 Am. St. Rep. 46; *Murray* v. *Galbraith,* 86 Ark.
50, 109 S. W. 1011, 126 Am. St. Rep. 1078; *Murray* v. *Gal-
braith,* 95 Ark. 199, 128 S. W. 1047. . . .''

In the Patton-Cruce case the defendant published the
following: ''John Patton, who is mayor, announces in
last week's Headlight that he will in the near future
launch a first-class weekly newspaper in this city, to fill
'the long felt want', and that it will have a larger circula-
tion than the 'Weekly Bunghole Sucker' . . . He does
not state whether or not he will backbite his friends and
lay down with his enemies, or even whether he will tell
secrets out of the lodge. There are many things he left
off his prospectus that the public is intensely interested
in, but then he is a rather peculiar individual, who can
change friends and issues upon very short order''.

It was alleged in the complaint that by this publication the defendant intended to falsely accuse Patton of being a secret slanderer and scandal monger, with betraying lodge secrets, and betraying his friends. In the Court's opinion Mr. Justice RIDDICK said that "This. if proved, was clearly libelous *per se.*"

In the second *Murray-Galbraith* case (95 Ark. 199, 128 S. W. 1047) it was held that one who publishes a false article calling into question the character of another for probity will not be liable for exemplary damages, but only for compensatory damages, unless there was ill will against the person assailed or the publication indicated a wicked and abandoned disposition on the publisher's part; nor may one who publishes a false article impeaching another's integrity prove the circumstances for the purpose of mitigating or reducing the amount of compensatory damages, as the law implies malice from the publication of a libel and gives the party injured redress by way of compensation".

The statement by a mill manager that one from whom lumber was being purchased was "short-stacking in order to get more scale", or that he was "stealing lumber scale", justified the jury in finding that the defendant was entitled to compensatory damages. *Joslyn Manufacturing & Supply Co.* v. *White,* 211 Ark. 362, 200 S. W. 2d 789.

In the instant case the jury did not allow exemplary damages. It is apparent that the triers of fact found, generally, that the charges were not sustained, but that they were made in the heat of a partisan or political campaign, and in circumstances where the parties directly concerned are apt to magnify and treat as important things that might otherwise be disregarded. It is a time when charges and countercharges find easy expression; when rival factions accept uncertain rumor as confirmation strong as proof of holy writ. But, irrespective of the impulse to accuse, under our system of government there are excesses beyond which one may not go without assuming the responsibility of compensation.

It was for the jury to say whether the publishers in asserting they had evidence enough to convict the "whole gang", were referring to criminal conviction or a conviction at the bar of public opinion. Likewise, when they denominated Judge Bond as leader of the corrupt remnant of the county gang—a gang that had brought federal investigations, convictions, wide publicity, and disgrace to the County and State, the ordinary implications could not be brushed aside with an explanation that no offense was intended. There was the further charge that "You and your gang got rich allowing gambling dens and brothels to operate openly". The implication is that in "allowing" the law violations complained of, these leaders were corrupted, for it is said that they got rich. Cheating, ordinarily, is a crime. When the defendants publicly proclaimed that the "gang" had cheated ignorant Negroes, and had [engaged in] various other grafts—in consequence of which they had grown rich—no construction other than a charge of dishonesty could attach, and the words were actionable *per se*. Their truth was the only defense. The jury chose to believe that the defamatory phrases did not find support in the conduct established.

Appellants think they were prejudiced by the Court's refusal to give their requested Instructions Nos. 3 and 4. No. 3 would have restricted the jury to consideration of editorials in which Judge Bond was directly named. The Court properly rejected it. Implications—that is, whether Judge Bond was or was not the object of attack—were for the jury's determination. This is true because it is a question of fact whether a reasonable person, while reading the publications, would have been justified in believing Judge Bond was being accused.

Requested Instruction No. 4 would have told the jury to find for the defendants if it determined that the editorial of August 27th did not misstate conditions when it asserted Judge Bond had corrupted the county road program to his own financial betterment. Effect would have been to peremptorily instruct as to the other charges, and confine the jury's consideration to the single edi-

torial. This, of course, could not be done, since even stronger language was found in some of the other publications.

The verdict was signed by ten of the jurors, and it expressly found that the award was for compensation.

The record is free of prejudicial errors, and the judgment must be affirmed. It is so ordered.