## SIMONSON *v.* LOVEWELL.

### Opinion delivered April 5, 1915.

1. LIBEL AND SLANDER—PRINTED ARTICLE—LIBEL PER SE.—An article published in a newspaper, charging plaintiff with dishonesty while holding a public office, held libelous *per se*, and the evidence held sufficient to sustain a verdict in plaintiff's favor.

2. TRIAL—PROVINCE OF JUDGE AND JURY—ADMONITION OF JUDGE—VERDICT.—The province of the court and jury in the trial of a cause is distinct and separate and the object of a jury trial is to get the free judgment of the jurors upon the facts in dispute; and the fundamental question to be determined in testing the language used by the court in admonishing the jury to reach a verdict is to determine whether the language used by the judge was calculated to coerce the jury, either by threat or by persuasion, into an unwilling verdict.

3. TRIAL—VERDICT—ADMONITION OF COURT.—When a jury is unable to agree upon a verdict, it is error for the trial judge to charge

them in such a way as to impress the minority with the idea that it is their duty to yield their judgment to the majority.

4.   LIBEL AND SLANDER—COMPENSATORY DAMAGES.—In an action for libel, in awarding compensatory damages, the jury may consider all the evidence in the case and if it finds that prior to the publication of the article sued on, that plaintiff bore the reputation of being a defaulter, or that his reputation for morality was bad, the jury may consider these facts in mitigation of damages.

Appeal from Crittenden Circuit Court; *J. F. Gautney*, Judge; reversed.

*J. T. Coston*, for appellant.

1. The admissions of plaintiff and the uncontradicted evidence show the *truth* of the publication, and the cause should be reversed and dismissed. 97 S. W. 55; 58 Ark. 105; 2 Atl. 524; 98 Pac. 286. The communication was privileged. 125 N. W. 272. It was not libelous *per se*. 46 Ia. 533; 60 *Id*. 251; 78 Kan. 711; 28 Minn. 162; 113 N. C. 203; 64 Tex. 354, and many others.

2. There is an irreconcilable conflict between instructions 11 and 15. 159 S. W. 34; 65 Ark. 66; 25 Cyc. 530, 418; 51 Atl. 709; 51 S. W. 872; 41 *Id*. 528; 20 N. H. 561; 27 Ind. 528; 81 S. W. 275; 20 So. 707.

3. Instruction 19 invaded the province of the jury and should not have been given, after the jury failed to agree. 115 S. W. 153; 8 Cush. 1; 164 U. S. 492; 196 *Id*. 307; 122 N. W. 322; 11 How. Pr. 260; 85 N. E. 138; 164 S. W. 719; 92 *Id*. 865, 1118; 58 Ark. 282; 84 S. W. 709; 85 N. E. 439; 1 S. E. 439; 73 *Id*. 759; 70 *Id*. 889; 147 Fed. 502; 103 S. W. 1189; 119 N. Y. Sup. 681; 41 Atl. 280; 29 N. E. 911; 10 N. W. 44; 90 S. W. 165; 80 N. Y. Sup. 582; 71 S. E. 799; 60 *Id*. 107; 196 U. S. 307; 70 S. E. 889; 73 *Id*. 759; 98 S. W. 145. It was error to inquire how the jury stood.

4. The verdict is excessive.

*A. B. Shafer* and *L. C. Going*, for appellee.

1. The article is libelous *per se*. 72 Ark. 421, 86 *Id*. 50; 95 *Id*. 207; 92 *Id*. 486; 105 *Id*. 254.

2. Instructions 11 and 15 are not conflicting.

3. The giving of instruction 19 was not reversible error. The court simply admonished the jury of the importance of an agreement if possible. 50 Ga. 53; 84 N. W. 906; 82 S. W. 569; 54 S. E. 255; 13 *Id.* 955; 10 *Id.* 233; 47 S. W. 1071; 36 Iowa, 1032, 9 S. E. 190. It was not injurious. 170 S. W. 993; 161 *Id.* 1052.

It is not improper to inquire how the jury stood. 196 U. S. 307; 70 S. E. 889.

4. The verdict is not excessive.

HART, J. This is an action by Jno. A. Lovewell against S. T. Simonson to recover damages for the publication of a certain alleged libelous article in the Luxora Commonwealth of March 19, 1910. The case was tried before a jury which returned a verdict for the plaintiff in the sum of $5,000 and from the judgment rendered the defendant has appealed. The article upon which the action of libel is based is as follows:

"WHO SHALL WE SELECT AS THE NEXT SHERIFF IS ONE OF THE MOST IMPORTANT QUESTIONS NOW BEFORE THE PEOPLE OF MISSISSIPPI COUNTY, IF NOT THE MOST IMPORTANT.

"(1) Shall it be C. B. Hall, who has in the short space of time in which he has had to prove himself, made one of the best and cleanest officers Mississippi County has ever known, and whose books are clean and whose settlements are right and up-to-date, or shall it be John Lovewell, who, after several terms in office and after ample opportunity to prove his worth and efficiency if it were in him, has proven his utter inefficiency and unworthiness and has abused and forfeited every right he may have had to the support, confidence and respect of the people of Mississippi County.

"(2) Instead of being the high-class gentleman to which he should have aspired and might easily have attained in his private life, he has forced upon and displayed before the people a record that has offended every sense of right thinking people. In fairness, what an example to the youth of our rapidly developing county to

confer such a conspicuous honor upon a man with such a record, and in effect to say to our sons, do likewise, and be honored. No, we could not so advise them for a hundred times the honor and compensation attached. Details are in disgusting abundance and reserve. Not for any fancied slight or dislike to the action of his friends and fellow county officers, should Mr. Hall lose one vote, but we should encourage a man who has made so excellent a record by strong support and re-election.

"(3) Even Mr. Hall's worst enemies have practically no foundation for their enmity, and it is clearly a distorted and perverted judgment that would lead to an endorsement of Lovewell's record in preference to Hall. The time has fully arrived when it is of urgent importance to support and encourage a worthy and competent official and endorse his record in the strongest way, which is by re-election.

"(4) Mr. Hall has taken a very impartial attitude in the matter of drainage, but the facts are that we should go forward with the improvement and development of our country in the most rapid and practical manner. Lovewell is the worst retarding influence we have. Men with the capital and ability to assist in this work do not care to come where the sheriff invites and encourages riot and disorder, even when the county court is in session, as we recently had a deplorable exhibition. True, this suits a few people we have yet with us, but happily their number is rapidly declining.

"(5) The land owner and even the humblest laborer should be for the early and full development of the country, and upon mature reflection all will be.

"(6) The construction of drainage ditches or districts eight and nine means the expenditure of many hundred of thousands of dollars which insures an advance in values of many hundreds of per cent above the assessment to the land owner, and the laborer will receive the greater bulk of the large expenditure for construction which will be followed by the expenditure of many hundreds of thousands of dollars immediately in the clearing

of lands which the poorer people of the county will receive. This will be followed by building of thousands of homes, barns, and thousands of miles of fences, small lateral ditches and good roads, all at an expenditure of hundreds of thousands of dollars, all of which will come to the hands and pockets of the laboring people and on to the merchant in payment of better and more food, clothing and furniture and for the payment on little homes and farms, then thousands of worthy and industrious people will come from other places where opportunities scarce exist and plow and gather most abundant crops from the lands that were formerly disgusting and malarious, disease breeding swamps and into which the doctor can not be induced to visit the poor man's family for a fee less than ten or fifteen dollars.

"(7) And yet the most that Lovewell's supporters seem to be able to say for him is that he has saved the poor people from this improvement and that he has been their friend, and How? By squandering and appropriating to his own uses the thousands of dollars of the people's money that should have been turned into the treasury of the county for the upbuilding of the county and the payment of the county's indebtedness, and we now experience an enormous raise in taxes made necessary very largely on account of the misappropriation of the county funds by the self-confessed benefactor of the county and friend of the people.

"(8) Here is one of the many comparisons which should cause the people to take notice. In the collection of the 1907 taxes Lovewell turned into the school fund $29,331.61. In the collection of the 1908 taxes on the same valuation, Hall turned into the school fund $36,-686.34, or $7,354.73 more than Lovewell, as shown by the public records.

"(9) In the case of the County against Lovewell, just tried in the chancery court, Lovewell made no defense that he had appropriated the county's funds as charged, but that he was saved from prosecution by the three years' statute of limitation and the judge held only

that the three years' time was a bar to the prosecution. What a record with which to come before the people for re-election. The attorneys for the people immediately filed their transcript preparatory for an appeal to the Supreme Court.

"(10)    The confidence man always poses as your friend and always will while getting his graft, and is usually conspicuous and busy with his advice to look out, for somebody else is trying to work a graft.

"(11)    It would be far more pleasant and infinitely to the credit of the county if such records as this had never been made, though such records and their maker, who is entitled to no screening or support, should be brought into the light and given their due then buried forever, and newer and better men and records supplant them at the earliest opportunity.

"(12)    Vote for C. B. Hall, who has nothing to cover up, and feel assured that your taxes will be used as they should.''

Simonson admitted that he was the author of the article and caused it to be published.

(1)    The article was libelous *per se*. *Patton* v. *Cruce*, 72 Ark. 421; *Murray* v. *Galbraith*, 86 Ark. 50; *Murray* v. *Galbraith*, 95 Ark. 199.

The record of the testimony in the case is voluminous and for the reason that the case must be reversed because the court erred in instructing or admonishing the jury upon the question of agreeing upon a verdict, we do not deem it necessary to abstract the testimony. It is sufficient to say that many witnesses were examined and that the testimony upon the question of the truth or falsity of the published article is in direct and irreconcilable conflict. Besides, upon a retrial of the case there may be additional and different testimony. We have carefully examined the record and are of the opinion that the testimony was sufficient to sustain the verdict.

After deliberating for some hours the jury returned into the court and reported that they were unable to agree upon a verdict. Thereupon the court said to the

jury, "Gentlemen, how do you stand?" and the foreman of the jury replied, "We stand nine to three." The court then of its own motion gave to the jury what is called instruction number 19, which is as follows:

"Gentlemen, under our laws and constitution we have only one method of settling disputed questions of fact, and that is by the verdict of a petit jury. The law requires that the verdict of the jury be the verdict of twelve men unless the parties otherwise agree to a less number. This agreement on the part of the parties to a lawsuit is rarely, if ever, obtained, so it is necessary in order to have a lawsuit finally disposed of that the jury render a verdict.

"It is not to be presumed that this case can ever be tried at any other time any better than it has been tried on this occasion, or that we will ever have another jury to try the case that will be any more honest or careful and painstaking than the jury we have at present. If you do not decide the case, it is left for some other jury to decide, and there is no reason why it should be done, if it can possibly be avoided.

"If, when you have discussed the case, you find that a large majority of the jury is for one side or the other, as the case may be and a few for the opposite side, then the minority ought to consider very carefully whether or not they are right and the others are wrong before they finally conclude to report a mistrial.

"You ought to discuss the matter among yourselves and endeavor as best you can to reach a conclusion. We make up our minds and opinions upon almost everything we experience in our lives from discussing those matters with other people. Very often we find people whose opinions upon a given state of facts are at variance with our own, and very often we find that our opinion is wrong and that of our neighbor is right. It is not to the discredit of any man that he may change his opinion, if, after a discussion, he ascertains that his opinion is wrong. This is not said to you for the purpose of changing your minds. No man ought to render a verdict in a case where

he conscientiously believes it is wrong; on the other hand, he ought to be reasonably sure he is right before finally concluding he will report a mistrial in a case.

"In the determination of this case you have very few questions to decide. The first is, was the publication true or false. If you find the alleged libel to be true, you will find for the defendant. If false, then the next question is the question of damages. These are the questions you have to decide.

"I am now going to ask you gentlemen to retire to your room and make another effort to reach an agreement. I do not do this because I have the power or authority to do it, but because I believe the jury should be given time and opportunity to reach an agreement. It is not to the discredit of the jury that it takes time to decide the suit. You may retire, gentlemen."

The language used by the court is assigned as error by counsel for the defendant.

Upon the question of how far the court may go in admonishing the jury of the necessity of agreeing upon a verdict, in the case of *St. L., I. M. & S. Ry. Co.* v. *Devaney,* 98 Ark. 83, the court said:

"In the conduct of the trial of causes the trial court is necessarily and rightfully vested with a large discretion. And, unless there has been a clear abuse or unwise exercise of that discretion, the appellate court should not interfere therewith. The trial judge should not make any remark to or in the hearing of the jury which would indicate his opinion as to the merits of the case or as to any fact involved therein. But he may properly admonish the jury as to the importance or desirability of their agreeing on a verdict. He should not by any word or act intimate that they should arrive at a verdict which is not the result of their free and voluntary opinion, and which is not consistent with their consciences; but still it is proper for the trial court to impress upon the jury the duty resting upon them to arrive at a decision. This court has said: 'It is entirely proper for a trial judge, at all stages of the deliberations of the jury, to make plain

the obligation resting upon them, if possible, to agree upon a verdict consistent with the facts and the concurring individual convictions of each juror.'"

In the case of the *St. Louis, I. M. & S. Ry. Co.* v. *Carter,* 111 Ark. 272, we said:

"The rule is well settled in this State that the trial court may detail to the jury the ills attendant on a disagreement and the importance of coming to an agreement. The trial judge should not, by threat or entreaty, attempt to influence the jury to reach a verdict. He should not, by word or act, intimate that they should arrive at a verdict which is not the result of their free and voluntary opinion, and which is not consistent with their conscience. He may, however, warn them not to be stubborn and to lay aside all pride of opinion and to consult with each other and give due regard and weight to the opinion of their fellow jurors."

(2)　In that case we recognized it to be the doctrine of this court that the province of the court and jury in the trial of a case was distinct and separate, and that the object of jury trial is to get the free judgment of the jurors upon the facts in dispute; and the fundamental question to be determined in testing the language used by the court in admonishing the jury to reach a verdict in a given case is to determine whether or not the language used by the judge was calculated to coerce the jury, either by threat or by persuasion, into an unwilling verdict.

In the *Carter* case, *supra,* we did not approve or disapprove the instruction given in the case of *Commonwealth* v. *Tuey,* 8 Cush. (Mass.) 1. We, as well as other courts which have had occasion to discuss the subject, recognized the *Tuey* case as a leading case on the question, and pointed out that it is generally regarded as a case approaching the border line of telling the minority of a disagreeing jury to agree with the majority merely for the sake of an agreement. We held that the language used in the *Carter* case went further than that used in the *Tuey* case, and that the tendency of the court's remarks was to create an impression upon the minds of the minority that

they should yield to the majority of the jury. In the *Tuey* case, the language of the trial court which was regarded as objectionable is as follows:

"And, on the one hand, if much the larger number of your panel are for conviction, a dissenting juror should consider whether a doubt in his own mind is a reasonable one, which makes no impression upon the minds of so many men, equally honest, equally intelligent with himself, and who have heard the same evidence, with the same attention, with an equal desire to arrive at the truth, and under the sanction of the same oath. And, on the other hand, if a majority are for acquittal, the minority ought seriously to ask themselves whether they may not reasonably, and ought not to doubt the correctness of a judgment, which is not concurred in by most of those with whom they are associated; and distrust the weight or sufficiency of that evidence which fails to carry conviction to the minds of their fellows."

A comparison of the language used by the court in the case at bar, and that used in the *Tuey* case will show that the court went further in this case than did the court in the *Tuey* case. In the *Tuey* case, the court had instructed the jury that before it could convict, it must be convinced beyond a reasonable doubt of the guilt of the defendant. The court, in admonishing the jury, in effect, told them that a juror should consider whether a doubt in his mind was a reasonable one when it made no impression on the minds of a majority of the jury; and that, on the other hand, if the majority of the jury were for acquittal, the minority ought to seriously ask themselves whether they should distrust the weight or sufficiency of the evidence which failed to carry conviction to the majority.

The meaning of the language used by the court in that case was that if a minority of the jury differed from the majority, the minority should carefully consider the evidence for the purpose of determining whether their own opinion was correct. In other words, the language of the court was equivalent to telling the minority that it should consider and examine carefully evidence which

failed to carry conviction to a majority of the jury. It did not tell the minority that it should give more effect to the opinion of the majority than it did to its own opinion, which would have been in effect to tell them that they should weigh the opinion of the majority instead of weighing the evidence.

In the instant case, the court said to the jury: "If you do not decide the case, it is left for some other jury to decide, and there is no reason why it should be done, if it can possibly be avoided."

"If, when you have discussed the case, you find that a large majority of the jury is for one side or the other, as the case may be, and a few for the opposite side, then the minority ought to consider very carefully whether or not they are right, and the others are wrong before they finally conclude to report a mistrial.

"* * * This is not said for the purpose of changing your minds. No man ought to render a verdict in a case where he conscientiously believes it is wrong; on the other hand, he ought to be reasonably sure he is right before finally concluding he will report a mistrial in a case."

(3) In the case before us the language used was calculated to impress the minority of the jury with the idea that it was their duty to yield their judgment to the voice of the greater number. The court did not tell them to weigh the evidence as it did in the *Tuey* case, but in effect told them that they should give weight to the opinion of the majority. This was not within the province of the court.

The case before us was a civil case, and, under the instruction of the court, was to be determined by the jury according to where it should find was the preponderance of the evidence. The case had been on trial for several days. Numerous witnesses had been introduced and examined and cross-examined at length. The record of their testimony is very voluminous. There was a sharp and irreconcilable conflict in the testimony given by the witnesses. After the jury had deliberated some hours, it

returned into court and reported that it could not reach an agreement. The court at once asked them how they stood, and when told nine to three, it immediately used the language which is the basis of the assignment of error under consideration. We do not doubt but that the court was actuated by proper motives, both for the interest of the public, and for the litigants in the case. But we are of the opinion that under the circumstances, a fair and reasonable construction of the language used was calculated to impress upon the minority that their opinion was entitled to less weight than that of the majority of the jury. As we have already seen, each party, as a fundamental right, was entitled to have the issues of fact determined by a unanimous verdict which had the independent assent of each member of the jury, and we are of the opinion that the language of the court was calculated to impress on the minds of the jury that the minority should yield its opinion to the majority for the sake of an agreement in the case. The minority should not be required to yield to the majority unless from conscientious convictions that the majority are right. Therefore, we are of the opinion that the court erred in the language used, and that for this error, the judgment should be reversed.

Inasmuch as the judgment must be reversed for the error just indicated, we desired to call attention to two other instructions given by the court, numbered respectively, 11 and 15. They are as follows:

"11. In determining the amount of damages you will award to the plaintiff, in the event you find for the plaintiff, you have the right to take into consideration all of the evidence in the case, and if you find that prior to the publication of said article plaintiff's reputation for morality was bad, and that he further bore the reputation of being a defaulter, then you may consider such evidence in mitigation of any damages you may award the plaintiff by way of compensation."

"15. You are further instructed that the evidence relating to the circumstances under which a libelous article is published, may be considered by you in determining

whether the plaintiff is entitled to vindictive or punitive damages from the defendant, but must not be considered by you in determining the amount of compensatory damages; that is to say, such evidence is not competent to reduce or mitigate compensatory damages."

(4)   It is claimed by counsel for the defendant that these instructions are in conflict. It will be noted that in instruction numbered 11, the court told the jury that in awarding compensatory damages, it had a right to take into consideration all the evidence in the case, and that if it found that prior to the publication of the article in question, the plaintiff bore the reputation of being a defaulter, or that his reputation for morality was bad, these facts might be considered by them in mitigation of damages. This instruction was correct, and no complaint is made by the defendant. The defendant does insist, however, that the instruction numbered 15 is in conflict with it because the court there told the jury that the evidence relating to the circumstances under which a libelous article is published may be considered in determining whether the plaintiff is entitled to punitive damages, but can not be considered in determining the amount of compensatory damages. Counsel for the defendant urges that the evidence relating to circumstances as used in the instruction includes evidence of the plaintiff's reputation for morality and the evidence that he bore the reputation of being a defaulter.

We do not think he is correct in this contention. The court evidently intended to use the word "circumstances" with reference to the facts leading up to the publication of the article and which caused its publication, and we do not think the court had in view the evidence relating to the plaintiff's reputation for morality or the evidence in regard to his being a defaulter. Therefore, we would not reverse the judgment on account of this assignment of error. The language of the instruction might have had a tendency to mislead the jury, and had counsel for defendant made a specific objection to it, doubtless the court would have changed it to obviate the objection of

defendant. We call attention to this matter now, so that the language of the instruction may be changed at the next trial should an instruction couched in the same language be presented to the court by the plaintiff, and should a specific objection be made to it by the defendant.

For the error in giving instruction numbered 19, the judgment will be reversed and the cause remanded for a new trial.