RAYMOND JANSSEN AND MILDRED E. JANSSEN

*v.*

CAROLINA LUMBER COMPANY, *A Corporation*

(No. 10484)

Submitted September 17, 1952. Decided November 18, 1952.

*Jenkins & Jenkins,* for plaintiff in error.

*Thomas W. Harvey, Duncan W. Daugherty,* for defendants in error.

GIVEN, JUDGE:

Plaintiffs, Raymond Janssen and Mildred E. Janssen, instituted their action of trespass on the case against the Carolina Lumber Company for damages allegedly resulting to a dwelling, constructed by plaintiffs in the City of Huntington, because of shrinkage of unseasoned lumber sold by defendant to plaintiffs. Judgment for $8,500.00 was entered upon a verdict for plaintiffs. The Circuit Court of Cabell County having overruled a motion to set

aside the verdict and grant the defendant a new trial, this writ of error was granted.

The declaration is in two counts. The first count charges that defendant undertook and agreed to sell unto plaintiffs lumber to be used in the construction of the dwelling and "expressly represented and warranted" that it could and would furnish lumber properly "seasoned and dried and not subject to shrinkage in the manner of green and unseasoned lumber", and plaintiffs relied upon the representation, and that defendant "falsely, fraudulently, and knowingly sold and delivered to the plaintiffs * * * quantities of lumber which were not seasoned and not dried and which were subject to shrinkage in the manner of green and unseasoned lumber." The second count charges that defendant "represented, declared, and warranted" that if plaintiffs would order from defendant the lumber "defendant would deliver to the plaintiffs only lumber which was seasoned and dried and not subject to shrinkage in the manner of green and unseasoned lumber"; that the lumber delivered was not seasoned and dried, but was subject to shrinkage in the manner of green and unseasoned lumber, and that the "representation and warranty aforesaid which was made by the defendant with respect to said lumber was knowingly, falsely, and fraudulently made so as to deceive plaintiffs and induce them to purchase said lumber from the defendant."

Construction of the dwelling was begun in January, 1950, and completed on August 3, 1950. Plaintiffs moved into the dwelling on August 4, 1950. The cost thereof was approximately $25,000.00, and plaintiffs contend that the amount of the damage which resulted to the dwelling from the shrinkage of the lumber would be approximately one-half of the cost thereof. All seem to agree that at the time the dwelling was accepted from the contractor by the owners, it was in satisfactory condition and no defects were apparent. But possibly in September, 1951, certainly not later than October, 1951, plaintiffs discovered that the floors were dropping in places, that the trim was breaking and tearing from the walls, that the plaster was cracking,

and that the walls were settling in certain places. The damages were extensive and throughout the dwelling. We do not understand the defendant to contend that the amount of the verdict is excessive. Neither does defendant contend that the damage resulting to the dwelling was not the result of shrinkage of lumber used therein and purchased from defendant. The construction of the dwelling was under the supervision of a general contractor, but the purchase of the lumber over which this controversy arose was made by plaintiffs, apparently without any suggestion or aid from the general contractor.

The contentions of defendant are that the lumber was permitted to absorb large amounts of moisture after it had been sold and delivered to plaintiffs and that plaintiffs, about July 11, 1950, installed a hot air furnace in the basement of the dwelling and failed to install, in connection therewith, a humidifier, which failure, together with excessive heat, caused the lumber to shrink excessively, resulting in the damages complained of. Considerable evidence was introduced by plaintiffs and defendant relating to the necessity of the installation of a humidifier and the probable results of the failure to do so; of the normal percent of relative humidity in the area of Huntington and the normal percent of moisture content in lumber properly seasoned and dried. As will appear later, however, no useful purpose will be served by stating this evidence in detail.

After plaintiffs had completed the taking of their evidence in chief, the defendant moved for a directed verdict on the ground that no competent evidence had been introduced which could support a verdict for plaintiffs, and upon the further ground that no evidence had been introduced upon which the jury "could assess any damages." After argument of the motion by counsel, the court was of the opinion to overrule the motion as to the first ground, but expressed some doubt as to the other ground. Whereupon, plaintiffs moved the court to permit them to reopen the case and to introduce further evidence, which motion was granted. Plaintiffs then introduced two witnesses

who testified as to the amount of damages resulting to the dwelling and gave estimates of the probable cost of necessary repairs or reconditioning. Defendant contends that the action of the court in reopening the case constitutes reversible error. We think not. "A trial court has discretion to reopen a case at the request of either party, after it has been closed and before it has gone to the jury, and admit evidence to prove an omitted fact." Point 6, syllabus, *Harrold* v. *City of Huntington*, 74 W. Va. 538, 82 S. E. 476. See *Sisler* v. *Shaffer*, 43 W. Va. 769, 28 S. E. 721; *McManus* v. *Mason*, 43 W. Va. 196, 27 S. E. 293; *Perdue* v. *Coal & Coke Co.*, 40 W. Va. 372, 21 S. E. 870; *Clarke* v. *Ohio River Railroad Co.*, 39 W. Va. 732, 20 S. E. 696.

After the case had been submitted to the jury and after the jury had deliberated for approximately four hours, and after having twice previously reported to the court that they were unable to agree on a verdict, the jurors were brought into the court room on order of the court and, upon being asked whether they had agreed, informed the court that they had not. Whereupon, the court addressed the jury as follows:

"Gentlemen, I have not inquired or permitted anyone to inquire how you stand in numers, or what the difficulty might be, because that is the jury's business and not necessarily the business of the court.

"You have now deliberated for more than four hours in this case, and you report that you have not yet been able to reach a verdict. It is useless for me, of course, to tell you gentlemen that hung juries settle nothing; that they are expensive; that a hung jury in this case will require another trial, thus taking the time of another jury to arrive at a verdict that you were selected to return, and taking the time of this court and the attaches of this court.

"For every day this court is in session it costs this county, for jurors alone, more than $170. And with a hung jury all of the trial time spent in this trial will be lost, which consisted of more than two days, besides the time

that the jury spent in deliberation. Part of that expense only will be borne by one of the parties to this suit, this suit that you tried; but the great portion of it will be paid by Cabell County.

"If this jury is a hung jury it is not the fault of the judge, it is not the fault of the lawyers, and it is not the fault of the parties or litigants. It is the jury's fault if you fail to agree. Everybody interested in this case wants these matters settled, and with the least possible expense.

"You as jurors are not expected to surrender your honest convictions in order to agree on a verdict. And it is the *jury* of an individual juror, after having fully considered the evidence in this case, the instructions of the court, the arguments of counsel, and consulted with his fellow jurors, not to surrender his own convictions simply because some or all of the other jurors entertain a different opinion.

"But the jury room is not a place to exhibit your pride of opinion or to be obstinate or hardheaded or unreasonable. It is the duty of a juror to discuss the evidence in a spirit of fairness and candor with his fellow jurors, and with an open mind; to give careful consideration to the views of his fellow jurors, and, if it can be done without a sacrifice of conscientious convictions, it is the jury's duty to agree on a verdict.

"And if you are alone or in a small minority, should you not ask yourself whether the thing you cling to as a conscientious conviction might in fact be only a mistake in judgment, and whether the great majority of your fellow jurors, who took the same oath as you took as a juror, and who have consciences to satisfy the same as you have, might be right and you wrong.

"Gentlemen, search your own consciences under your oath, return to your jury room and discuss and deliberate among yourselves with a spirit of fairness and reasonableness and with an open mind, give careful consideration to the views of your fellow jurors, and in that spirit do

your best to reach a verdict in this case." Counsel were then asked if there were any objections to the remarks of the court and, being informed by counsel for defendant that there was an objection, the court replied, "Make it in open court", which was done. After considering the objection, the jury was sent back to its room and shortly thereafter returned to the court room with the verdict. Twenty-two minutes elapsed from the time the jury was sent for by the court until the jury returned to the court room with the verdict. This short period included the time consumed in addressing the jury, the objection thereto, the ruling thereon, and the time consumed in moving the jury from one place to another.

Defendant contends that the remarks or advice of the court to the jury, quoted above, amounted to coercion on the part of the court and improperly induced the verdict. What amounts to such coercion has often been discussed by the courts, and probably no general or definite rule as to what will constitute such coercion can be deduced or formulated from the decisions. Each case, to a very great extent, necessarily depends upon its own facts and circumstances. Similar cases are, of course, helpful. In *Lennox v. White,* 133 W. Va. 1, 54 S. E. 2d 8, Point 3, syllabus, this Court held: "It is error for a trial judge to inquire as to the numerical vote of a jury and, after being informed that their vote stands eleven to one, to advise them that it is their duty to arrive at a verdict if humanly possible consistent with right and justice." In the instant case the numerical standing of the jury was not disclosed to the court. Yet that fact was known to each of the jurors, and no doubt the advice of the court was considered and applied in the light of that knowledge. In the cited case the jury was told to arrive at a verdict if "humanly possible and consistent with right and justice to compose your differences," but that no coercion was intended by the court. In the instant case the jury was told that "It is the jury's fault if (they) fail to agree," and that "if you are alone or in a small minority, should you not ask yourself whether the thing you cling to as a conscientious

conviction might in fact be only a mistake in judgment, and whether the great majority of your fellow jurors, who took the same oath as you took as a juror, and who have consciences to satisfy the same as you have, might be right and you wrong." This strong language addressed to the minority, in the circumstances of the case detailed above, together with the fact that the verdict was returned within such a short time as to disclose that no further consideration of the evidence offered could have been had by the jury, forces us to the conclusion that the quoted remarks, in the circumstances, constituted prejudicial error. We believe the remarks, though of course not intended to do so, had the effect of causing the minority to yield its view for the mere purpose of reaching an agreement. See *Emery* v. *Service Co.*, 111 W. Va. 699, 163 S. E. 620; *State* v. *McKinney*, 88 W. Va. 400, 106 S. E. 894; *Mead* v. *City of Richland Center*, 237 Wis. 537, 297 N. W. 419; *Decker* v. *Schumacher*, 312 Mich. 6, 19 N. W. (2d) 466; *In Re Miller's Will*, 270 App. Div. 826, 60 N. Y. S. 2d 100; *J. F. McGehee & Co.* v. *Fuller*, 169 Ark. 920, 277 S. W. 39; *Simonson* v. *Lovewell*, 118 Ark. 81, 175 S. W. 407; *Middle States Utilities Co.* v. *Telephone Co.*, 222 Iowa 1275, 271 N. W. 180, 109 A. L. R. 66; *Clemens* v. *Railway Co.*, 163 Iowa 499, 144 N. W. 354; *Eikmeier* v. *Bennett*, 143 Kan. 888, 57 P. 2d 87.

As has been noted, this action is one sounding in tort, for fraud and deception. Defendant contends that plaintiffs offer no evidence tending to establish fraud or deception and that, therefore, no evidence supports the verdict. No question arises concerning whether plaintiffs had the right to waive as to any right of action in contract and to elect to sue in tort, and no question is raised as to the sufficiency of the declaration setting up a cause of action for fraud and deceit. But does the evidence establish fraud on the part of defendant with reference to the quality or dryness of the lumber sold and delivered, or a violation of a contract with reference thereto? A rule followed almost universally, and applicable here, requires that to sustain a recovery the proof must correspond with

the essential allegations of the declaration. *"Allegata* and *probata* must correspond. Where there is no count in a declaration on the cause of action shown by the evidence, it is a variance, and there can be no recovery." Point 3, syllabus, *Riley* v. *Jarvis, et al.,* 43 W. Va. 43, 26 S. E. 366. See *Evans* v. *Kelley,* 49 W. Va. 181, 38 S. E. 497; *Fadely* v. *Tomlinson,* 41 W. Va. 606, 24 S. E. 645; *Wass* v. *Wass,* 41 W. Va. 126, 23 S. E. 537; *Currey* v. *Lawler,* 29 W. Va. 111, 11 S. E. 897; *Damarin* v. *Young,* 27 W. Va. 436; *Doonan* v. *Glynn,* 26 W. Va. 225; *Pusey* v. *Gardner,* 21 W. Va. 469; 14 M. J., Pleading, Section 63.

Raymond Janssen, one of the plaintiffs, who actually purchased the lumber in question, testified that nego-tiations made for the purchase of the lumber extended over a period of about one year, and that he finally deter-mined to purchase the lumber from defendant about Christmas, 1949. Construction of the dwelling was begun in January, 1950. His own testimony, upon which the alle-gations of the declaration are founded, is: "When I first went to them with my plans I was in contact with Mr. Messinger, who is the man who does the estimating on plans and specifications. And I told him that I wanted to be sure that my house would not suffer from the conse-quences of any improperly seasoned lumber as I had heard occurred after the war in other houses.

"And he assured me that if I bought my lumber from him that I would get thoroughly, properly seasoned lum-ber, and that I would have no difficulty with it whatever. In fact, he went on to say that properly seasoned lumber was the only kind which they sold.

"Then later when I talked to Mr. Zeller I asked him also whether I could depend upon the lumber being pro-perly seasoned and satisfactory, and he also assured me that I could. Q. Can you state approximately when these times were that you spoke with Mr. Messinger and Mr. Zeller? A. Yes, they were during that Christmas vaca-tion of 1949 and previous to that, when I first began ne-gotiating with them. On that particular final plan that

we discussed would have been probably as much as a month ahead of that. Q. Was there any understanding between you and Carolina Lumber Company as to how much or what part of your lumber you would buy from them? A. I told them if they would guarantee me good, well seasoned, proper lumber, I would buy all of it from them." Other testimony relates to representations made by defendant as to the quality or dryness of the lumber, or as to the contract of purchase, but which representations were made subsequent to the time the lumber was placed in the structure. In this evidence can there be found fraud, deceit or any false representation? We think not. At most, there was a mere promise or agreement to sell properly seasoned lumber, not a false representation as to an existing fact. Failure to fulfil a promise is not sufficient to establish fraud in the inception of the contract. *Kimmel* v. *Coal & Mining Co.*, 97 W. Va. 154, 124 S. E. 661.

In 37 C. J. S., Fraud, Section 11, it is stated: "As appears supra §6, the representation required, in order that there be actionable fraud, must ordinarily relate to a past or existing fact, or to an alleged past or existing fact, and not to future occurrences. So the general rule, which is subject to qualifications later appearing, is that fraud cannot be predicated on statements which are promissory in their nature, or constitute expressions of intention, and an actionable representation cannot consist of mere broken promises, unfulfilled predictions or expectations, or erroneous conjectures as to future events, even if there is no excuse for failure to keep the promise, and even though a party acted in reliance on such promise; nor, as appears infra §116, is the mere nonperformance of a promise evidence establishing fraud or lack of intent to perform. Predictions as to future events are ordinarily regarded as nonactionable expressions of opinion on which there is no right to rely, and obviously cannot constitute fraud where made in the honest belief that they will prove correct. * * *."

This Court held in Point 2, syllabus, *Love* v. *Teter*, 24

W. Va. 741: "In morals the failure to perform a promise may be without excuse or justification; but in law false representations to authorize the rescission of a contract must be made in regard to *existing facts.*" See *Cottrell* v. *Nurnberger,* 131 W. Va. 391, 47 S. E. 2d 454, 5 A. L. R. 2d 1298; *Buena Vista Co.* v. *Billmyer,* 48 W. Va. 382, 37 S. E. 583.

Where it is shown that no intention existed to keep the promise, an exception to the rule laid down in the *Teter* case is pointed out in *Dyke* v. *Alleman,* 130 W. Va. 519, 44 S. E. 2d 587, and in *Davis* v. *Alford,* 113 W. Va. 30, 166 S. E. 701. The exception has no application here. For other authorities supporting the rule laid down in the *Teter* case, see *Soble* v. *Herman,* 175 Va. 489, 9 S. E. 2d 459; *Lloyd* v. *Smith,* 150 Va. 132, 142 S. E. 363; *Dudley* v. *Minor's Exr's,* 100 Va. 728, 42 S. E. 870; *Pierce, et al.* v. *Sicard, et al.,* 176 Ark. 511, 3 S. W. 2d 337; *Lowe* v. *Kohn,* 128 Conn. 45, 20 A. 2d 407; *Dolle* v. *Melrose Properties,* 252 Ky. 482, 67 S. W. 2d 706; *Coe* v. *Ware,* 271 Mass. 570, 171 N. E. 732; *Adams* v. *Gillig,* 199 N. Y. 314, 92 N. E. 670, 32 L. R. A. (N. S.) 127.

Applying the principle followed in the cases cited, we necessarily hold that the proof does not support the allegations of the declaration, necessitating the setting aside of the verdict.

The judgment of the Circuit Court of Cabell County is reversed, the verdict of the jury is set aside, and the case is remanded.

*Reversed;*
*verdict set aside;*
*remanded.*