464 S.E.2d 728

Amon CROSTON, Lois Croston, Rettie Newman and Fred Newman, Plaintiffs Below, Appellants,

v.

EMAX OIL COMPANY, A VIRGINIA CORPORATION, Defendant Below, Appellee.

No. 22686.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 27, 1995.

Filed Oct. 30, 1995.

Thomas R. Michael, Michael & Kupec, Clarksburg, for appellants.

Boyd L. Warner, Waters, Warner & Harris, Clarksburg, for appellee.

ALBRIGHT, Justice:

This is an appeal by Amon Croston and others from an order of the Circuit Court of Barbour County granting the appellee, Emax Oil Company, summary judgment in an action brought by the appellants over an oil and gas lease. The appellants alleged in their complaint that Emax Oil Company had induced them to enter into the lease through fraud and had then failed to protect their land from drainage by another well drilled by Emax on an adjoining tract of land. On appeal, the appellants claim that there were issues of material fact remaining when summary judgment was entered and that, under the circumstances, the circuit court erred in granting the motion. After reviewing the questions raised and the facts presented, this Court disagrees with the appellants' assertions. The judgment of the circuit court is, therefore, affirmed.

Amon Croston and the other appellants in this proceeding owned approximately fourteen and one-half acres located in Barbour County, West Virginia, when, in 1991, the appellee, Emax Oil Company, showed an interest in leasing certain land in the area. Upon learning that Emax had an interest in leasing land in the area, the appellants contacted Emax and expressed an interest in leasing their property to Emax.

The record shows that, while negotiations were in progress, the geologist for Emax believed that the appellants' tract could be unitized or "pooled" with adjoining land, including a tract owned by Roy and Ruth Ann Mayle. Further, according to evidence adduced by the appellants, during the discussions, the appellants were positively told that their tract would be unitized or "pooled" with the Mayle tract.

On May 1, 1991, the appellants entered into the lease in issue in the present case. That lease contained a number of provisions particularly relevant to the present proceeding. First, it provided that Emax Oil Company had the right to surrender the lease, apparently at any time, for cancellation. It specifically stated:

> [T]he party of the second part [Emax Oil Company], its successors and assigns, shall have the right to surrender this lease for cancellation, after which all payments and liabilities thereafter to accrue under and by virtue of its terms shall cease and determine, and this lease becomes absolutely null and void.

The lease also provided that Emax could unitize or "pool" the appellants' acreage with other acreage. The lease provided:

> The Lessor further grants to Lessee, his heirs and assigns, the right to unitize this lease or any part thereof with other leases to prevent unnecessary drilling for and excessive depletion of such natural resources or to meet Gas Purchase Contract acreage requirements in the procuring of such contracts or to obtain maximum payments permitted by such contracts. In the event this lease is so unitized, the Lessor agrees to accept, in lieu of the royalty herein before recited, such proportion of the royalty above provided, as the acreage unitized by this lease bears to the total acreage comprising the unit. Unitization has the same effect as if a well were drilled on this tract, excepting provisions for free gas.

Lastly, the lease contained two somewhat conflicting free gas clauses. The first free gas clause, which was a part of the printed form which provided the essential background or structure of the lease, provided:

> The Lessor may, at his sole expense, from any one well drilled on said land at a point of connection designated by the Lessee, take gas therefrom free for his own use, subject, however to the operations, maintenance and abandonment of the well by Lessee. Lessor is to install and use such gas in a safe, proper manner at their own risk thereby releasing and discharging Lessee from any liability arising therefrom. Said free gas shall be limited to 200,000 cubic feet annually and all gas in excess of said limit shall be paid for by the

Lessor at the current price of the gas utility serving the area.

The second free gas clause, which was typed onto the basic form, stated:

Free gas will be available at the wellhead with a limit of 200,000 cubic feet. It can be divided between three dwellings and gas used over the limit will be withheld from the royalty of the party or parties using the gas. This applies to any well drilled on the lease or any lease pooled herewith.

After the appellants executed the lease, Emax Oil Company drilled a well on the adjoining Mayle tract within forty feet of the appellants' property. This well was a "shallow well" within the definition of W.Va.Code § 22C–8–2(21), and it appears to have been drilled for new production and not for secondary recovery purposes.[1] A second well was drilled on another neighboring parcel within several hundred feet of the appellants' property. This well was also a shallow well within the statutory definition and appears also to have been drilled for new production and not for secondary recovery purposes. Although the drilling produced wells capable of production, actual production was delayed because of the necessity of constructing pipelines to collect and transport the gas.

According to the appellants, after the two wells were drilled Emax contacted them and demanded that they sign a new lease without a free gas clause. Emax was apparently concerned that, given the conflicting free gas clauses in the appellants' lease, as well as the language in its leases with the Mayles and other lessors, it could not legally supply the appellants with free gas from a unit or pool.

In the discussions relating to a new lease, the appellants remained adamant on the free gas issue, and when it appeared that a new agreement could not be reached between the parties, Emax surrendered the lease on October 9, 1992, pursuant to the surrender and cancellation right granted to it in the lease.

Emax did not begin actual production of gas from its wells on the land adjoining that of the appellants until August 4, 1993, almost a year after it surrendered the lease with the appellants.

On May 6, 1993, before actual production on the adjoining tracts began, the appellants filed the complaint instituting the present proceeding. The complaint contained the following allegation:

The Defendant [Emax Oil Company] has made willful, and intentionally fraudulent, and false misrepresentations to the State of West Virginia and to the Plaintiffs and has intentionally attempted to subvert and destroy the implied covenant to protect against drainage and has in fact failed to protect against drainage of the Plaintiffs' oil and gas.

Following the filing of the complaint and other pleadings, extensive discovery was conducted. Thereafter the appellee, Emax Oil Company, moved for summary judgment. The circuit court granted that motion on June 2, 1994. In granting the motion, the court specifically found that Emax Oil Company had the right to surrender the lease and that the lease was surrendered prior to the time Emax Oil Company began production on an adjoining lease. The court also, in essence, found that there had been no drainage of the appellants' property while the lease was in effect and that Emax had not violated any duty which it owed the appellants to protect their property against drainage.

In the present appeal challenging the granting of summary judgment, the appellants argue two points. First, they claim that the evidence before the court at the time of the granting of summary judgment created a genuine issue of fact as to whether during the initial negotiations over the leasing of the appellants' property, Emax Oil Company promised them that their property would be unitized or pooled with the Mayle property and that they were thus fraudulently induced into leasing their property to Emax. Second, the appellants claim that Emax had a duty to protect their property against drainage, that this duty included an

1. The language of W.Va.Code § 22C–8–2(21) defining a shallow well is quoted *infra* in the body of this opinion.

implied duty to pool or unitize their property, and that the evidence, at the very least, raised a genuine issue of material fact as to whether Emax complied with this duty.

■ In addressing the issues raised by the appellants, this Court initially notes that it has rather consistently recognized that:

"A motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify that application of the law." Syllabus point 3, *Aetna Casualty & Surety Co. v. Federal Insurance Co. of New York*, 148 W.Va. 160, 133 S.E.2d 770 (1963).

Syllabus point 1, *Andrick v. Town of Buckhannon*, 187 W.Va. 706, 421 S.E.2d 247 (1992). The Court has also recognized that:

Summary judgment is appropriate where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, such as where the nonmoving party has failed to make a sufficient showing on an essential element of the case that it has the burden to prove. Syllabus point 4, *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994).

■ Next, we address the question of whether the trial court erred in granting summary judgment on the appellants' claim that Emax Oil Company committed fraud in the inducement in procuring the lease of their property. In *Janssen v. Carolina Lumber Company*, 137 W.Va. 561, 73 S.E.2d 12 (1952), this Court analyzed the concept of fraud and indicated that actionable fraud must ordinarily be predicated upon an intentional misrepresentation of a past or existing fact and not upon a misrepresentation as to a future occurrence. Somewhat similarly, it cannot be based on statements which are promissory in nature or which constitute expressions of intention, unless the non-existence of the intention to fulfill the promise at the time it was made is shown. Predictions as to future events, made in the honest belief

that they will prove correct, cannot serve as the basis of fraud. In ruling in *Janssen*, the Court followed syllabus point 1 of *Love v. Teter*, 24 W.Va. 741 (1884), which states:

Fraud cannot be predicated on a promise not performed. To make it available there must be a false assertion in regard to some *existing* matter by which a party is induced to part with his money or his property.

It appears to this Court that the ground upon which the appellants predicate their claim of fraud is the alleged assertion by Emax that the appellants' property would be unitized or "pooled" with the Mayle property, that is, on an assertion or a statement of opinion relating to a future event.[2] Ordinarily, as previously stated, such an expression of intention or opinion will not serve as the predicate of fraud unless the party claiming fraud shows the non-existence of the intention to fulfill the promise or predicted act at the time the promise or predicted act was made.

In their appeal petition, the appellants properly quote and characterize much of the testimony and other evidence which was developed before the circuit court prior to the entry of summary judgment. Among other things, they focus on the testimony of David Hamrick, the land man for Emax Oil Company who negotiated their lease. The appellants' brief states:

Mr. Hamrick said that the Mayle tract was 12 acres, the Croston tract [the appellants' tract] was 15 acres, and that the total acreage on the plat indicated that the company geologist thought it was going to be a pooled venture. At that time the company planned to pool the two tracts.

Then, according to the brief, it was only later that John Haskins, who was President of Emax Oil Company, indicated that the lease could not be pooled because it allowed them to get free gas from another person's well.

---

**2.** As previously indicated, the appellants, relating to the allegation of fraud, simply assert that: "The Defendant [Emax Oil Company] has made willful, and intentionally fraudulent, and false misrepresentations...." They do not, with particularity, point to the specific misrepresenta-

tions upon which they predicate their claim of fraud, and this Court's assessment of what the misrepresentations were is gleaned from the appellants' brief and other documents in the case, as well as from the complaint.

Certainly, the clear import of the testimony was that Emax believed that "pooling" would occur at the time the lease was negotiated, but that later events rendered the pooling impossible. In this Court's view, the evidence fails to show that Emax did not intend to carry out its representation to pool at the time the appellants' lease was negotiated. To the contrary, the evidence rather clearly indicates that the expression of intention was a truthful expression of intention, but that subsequent events rendered the execution of the intention inappropriate.

■ It is noted that the allegations of fraud in the complaint are general and fail to meet the requirements of Rule 9(b) of the West Virginia Rules of Civil Procedure, which provides in pertinent part that: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." The failure to plead particularly the circumstances constituting fraud not only inhibits full review of the substance of the claim of fraud by this Court on appeal from the grant of summary judgment; such failure also would have precluded the introduction of evidence supportive of the general allegation of fraud contained in the complaint had the case gone to trial. *Hager v. Exxon Corporation*, 161 W.Va. 278, 241 S.E.2d 920 (1978).

■ As previously indicated, the appellants' second assertion is that the appellee, Emax Oil Company, had an implied duty to protect the appellants' property against drainage, after entering into the 1991 lease with the appellants. They also claim that this duty included a duty to unitize or "pool" their property, and that the evidence, at the very least, raised a genuine issue of material fact as to whether Emax complied with such duty.

■ Under West Virginia law, it is clear that Emax had a duty to refrain from draining the appellants' oil and gas and to protect their land from drainage while the lease between the parties and the leases between Emax and the Mayles or between Emax and other adjoining lessees were in effect. As stated in syllabus point 1 of *Dil-*

*lard v. United Fuel Gas Company*, 114 W.Va. 684, 173 S.E. 573 (1934):

"Where the same lessee holds under two adjoining lessors, he may not fraudulently or evasively so drill his wells as to drain the property of one to the detriment of the other." *Barnard v. Monongahela Natural Gas Co.*, 216 Pa. 362, 65 Atl. 801.

This duty to protect against drainage is predicated upon the notion that, in the absence of an express provision to the contrary in a lease, there is an implied covenant in the lease that the lessee will protect lessor's property against substantial drainage. *See*, R. Donley, *The Law of Coal, Oil and Gas in West Virginia* § 97 (1951); *Jennings v. Southern Carbon Co.*, 73 W.Va. 215, 80 S.E. 368 (1913); and *Hall v. South Penn Oil Co.*, 71 W.Va. 82, 76 S.E. 124 (1910).

The evidence in the present case shows that the appellee, Emax Oil Company, after drilling on the land adjoining the appellants' property, offered the appellants a new lease under which Emax was able and willing to pool their land with the land on which the well had been drilled. The reason for a new lease being offered was the difficulty created by the special free gas provisions contained in the original Emax lease negotiated with the appellants. The evidence further discloses that those special provisions, providing for free gas from any well drilled within a "pool," created problems with the owners of adjoining lands both with respect to providing free gas to a property owner from wells on lands belonging to others and with respect to providing pipeline rights of way from the appellants' land to a well head situate on the lands of another. It appears to this Court that the offer of a substitute lease before production commenced from the drilled wells constituted a good faith effort to avoid violation of the implied covenant against drainage.

We move next to the surrender and cancellation by the appellee of the original Emax lease with the appellants, again before production commenced on the adjoining tracts. Although under the rule set forth in syllabus point 1 of *Dillard v. United Fuel Gas Company, supra*, Emax Oil Company had the implied duty to protect against drainage while the appellants' lease with Emax was in

effect, a question arises as to whether Emax could properly surrender and cancel the appellants' lease after it had successfully drilled wells on adjoining lands that offered the potential for violating the implied covenant against drainage from the appellants' land.

As noted, when the problem arose relating to the two conflicting free gas clauses contained in the appellants' lease, and it appeared the free gas clauses prevented "pooling" of the appellants' tract, Emax made a good faith effort to negotiate a new lease which would render unitization or "pooling" possible. The appellants nonetheless blocked the attempt to negotiate and insisted on the inclusion of a provision that was apparently impossible to perform. When Emax's good faith effort to negotiate a solution failed, Emax, under a right clearly and expressly given to it in the original lease, surrendered that lease.

This Court can find nothing in the renegotiation process that was inappropriate or fraudulent, given the wording of the original lease and given the position assumed by the appellants during the subsequent negotiations. We conclude that based upon the evidence developed below prior to the grant of the motion for summary judgment and in the absence of particular allegations of fraudulent conduct by Emax, and especially in light of the offer by Emax and rejection by the appellants of a new lease excising the original provisions for free gas, there is no basis upon which the equitable principle enunciated in the second syllabus of *Dillard, Id.*, might be properly applied. In Syllabus 2 of *Dillard,* the Court said:

> Equity has jurisdiction to protect a lessor in an oil and gas lease from drainage of said minerals from his property by the *fraudulent* conduct of the lessee. (Emphasis added).

We note that there is no factual dispute over the fact that no drainage occurred while the appellants' lease was in effect. The Court cannot conclude that the circuit court erred in entering summary judgment under the authorities heretofore cited.

In discussing the duty of Emax to protect their property, the appellants urge this Court to expand the duty to protect against drainage to require a lessee to seek to unitize or "pool" a tract being drained when the drainage is from a well on an adjacent tract operated by the same lessee. The argument that there should be an implied duty to unitize or pool which the appellants advance is based upon the concepts enunciated in an article by George W. Hardy, III, contained in 6 Natural Resources Journal 45 (1966), titled "Drainage of Oil and Gas from Adjoining Tracts—A Further Development." That article discusses the ruling of a federal court of appeals in *Williams v. Humble Oil and Refining Company,* 432 F.2d 165 (5th Cir.1970). In that case, the court held that, under Louisiana law, where a mineral lease contains an express requirement to protect against drainage, there is also an implied covenant or requirement that a parcel be pooled with an adjoining lease. The *Williams* decision appears to have no analog in West Virginia's common or statutory law.

Finally, we are mindful that the Legislature has enacted a comprehensive scheme for the regulation of pooling and spacing of oil and gas wells. *See* W.Va.Code § 22C–8–1 *et seq.* and W.Va.Code § 22C–9–1 *et seq.* The legislative enactments require mandatory pooling or unitization only in certain circumstances involving so-called deep wells, involving shallow wells drilled in coal fields, and involving shallow wells which are a part of a secondary recovery program.[3] A deep well

---

**3.** In *Powers v. Union Drilling, Inc.,* 194 W.Va. 782, 461 S.E.2d 844 (1995), the Court recognized that, even under leases for deep wells, a driller has discretion to determine whether to unitize under W.Va.Code § 22C–9–7(a)(1). The Court said:

> The language of West Virginia Code § 22C–9–7(a)(1) with regard to drilling units is clearly stated in discretionary terms. That subsection provides that "[a]fter one discovery deep well has been drilled establishing a pool, an appli-

cation to establish drilling units *may* be filed with the commissioner...." W.Va.Code § 22C–9–7(a)(1) (emphasis supplied). The legislators' choice of the term "may" leaves no doubt that availment of the procedures for establishing drilling units was intended to operate in a discretionary, rather than an obligatory, manner.

*Id.* 194 W.Va. at 786, 461 S.E.2d at 848.

In the same case, the Court also recognized that a land owner whose land would potentially

is defined by W.Va.Code § 22C-8-2(8) as follows:

> "Deep well" means any well other than a shallow well, drilled and completed in a formation at or below the top of the uppermost member of the "Onondaga Group."[4]

A shallow well is defined by W.Va.Code § 22C-8-2(21) as follows:

> "Shallow well" means any gas well drilled and completed in a formation above the top of the uppermost member of the "Onondaga Group": Provided, That in drilling a shallow well the well operator may penetrate into the "Onondaga Group" to a reasonable depth, not in excess of twenty feet, in order to allow for logging and completion operations, but in no event may the "Onondaga Group" formation be otherwise produced, perforated or stimulated in any manner.[5]

Nothing in the record before us suggests that the wells involved in this action were deep wells, shallow wells drilled in coal fields, or shallow wells involved in secondary recovery, or that they otherwise fall within the statutory scheme adopted by the Legislature for compelling "pooling" and unitization. Moreover, we regard the declaration of the Legislature with respect to the public interest in pooling, unitization and spacing of shallow wells to be dispositive of the suggestion by the appellants that this Court require such pooling in this or other cases. In W.Va. Code § 22C-9-1(b), the public policy of the State in this regard is set forth as follows:

> (b) The Legislature hereby determines and finds that oil and natural gas found in West Virginia in shallow sands or strata have been produced continuously for more than one hundred years; that oil and gas deposits in such shallow sands or strata have geological and other characteristics different than those found in deeper formations; and that in order to encourage the maximum recovery of oil and gas from all productive formations in this state, *it is not in the public interest, with the exception of shallow wells utilized in a secondary recovery program, to enact statutory provisions relating to the exploration for or production from oil and gas from shallow wells, as defined in section two [§ 22C-9-2] of this article,* but that it is in the public interest to enact statutory provisions establishing regulatory procedures and principles to be applied to the exploration for or production of oil and gas from deep wells, as defined in said section two. (Emphasis added.)

This declaration of the public interest was first enacted in 1972. *See* 1972 W.Va. Acts, ch. 69 and current W.Va.Code § 22C-9-1 *et seq.* We note that the Legislature subsequently relaxed this policy by enactment of provisions for pooling of shallow wells to be drilled in coal fields, first enacted in 1978. *See* 1978 W.Va. Acts, ch. 84, and current W.Va.Code § 22C-8-1 *et seq.* However, it appears that the declaration of public interest found presently in W.Va.Code § 22C-9-1(b) otherwise clearly sets out the current public policy of the State with respect to the appellants' suggestion that the duty to "pool" or unitize shallow oil and gas wells be further expanded.

 Accordingly, the Court concludes that although an oil and gas lessee, who also is lessee of adjoining land, has a duty to avoid the fraudulent or evasive drainage of the property of one to the detriment of the other, there presently is no implied duty to unitize or "pool" the leasehold of the one with the leasehold of the other with respect to shallow wells not located in a coal field or utilized in a secondary recovery program.

For the reasons stated, the judgment of the Circuit Court of Barbour County is affirmed.

Affirmed.

---

be drained by a deep well, and who refuses to ratify an agreement which would allow the inclusion of his land in a unit with the draining-well owners, has no legal right to recover for the drainage of his land.

**4.** A definition of "deep well" using the same words is set forth in W.Va.Code § 22C-9-2(12).

**5.** "Shallow well" is defined the same way in W.Va.Code § 22C-9-2(11).